Present:  All the Justices

THOMAS ALEXANDER PORTER

v.  Record Nos. 071928
          & 071929

OPINION BY
JUSTICE G. STEVEN AGEE
June 6, 2008

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Charles D. Griffith, Jr., Judge

In this appeal, we review the capital murder conviction and sentence of death imposed upon Thomas Alexander Porter in the Circuit Court of the City of Norfolk.  In the first stage of a bifurcated trial conducted under Code § 19.2-264.3, a jury convicted Porter of capital murder, use of a firearm in the commission of a felony, and grand larceny.[1]  In the penalty phase of the trial, the jury found the aggravating factor of future dangerousness and fixed Porter's sentence at death for the capital murder charge and a combined twenty-two years for the two other charges.  The circuit court sentenced Porter in accordance with the jury's verdicts and entered final judgment.

---

[1] Porter was also charged with one count of possessing a firearm as a previously convicted felon in violation of Code § 18.2-308.2.  An order of nolle prosequi as to that charge was entered on July 16, 2007.

We review the circuit court's judgment and death sentence pursuant to Code § 17.1-313(A).[2] After mature consideration of Porter's assignments of error, the record, and the arguments of counsel, we find no error in the judgment of the circuit court and will affirm that judgment, including the sentence of death.

## I. BACKGROUND AND MATERIAL PROCEEDINGS BELOW

Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party in the circuit court. Gray v. Commonwealth, 274 Va. 290, 295, 645 S.E.2d 448, 452 (2007), cert. denied, ___ U.S. ___, 128 S.Ct. 1111 (2008); Juniper v. Commonwealth, 271 Va. 362, 376, 626 S.E.2d 383, 393, cert. denied, ___ U.S. ___, 127 S.Ct. 397 (2006).

### A. FACTS ADDUCED AT TRIAL[3]

At approximately 3:30 p.m. on October 28, 2005, Porter and Reginald Copeland traveled in Porter's Jeep to the Park Place apartment complex located at 2715 DeBree Avenue in the City of Norfolk to inquire about purchasing marijuana.

---

[2] Porter has not assigned error to his convictions on the non-capital offenses. Accordingly, those convictions are final and are not before us in this appeal.

[3] Certain facts relating to the specific assignments of error will be stated or more fully described in the later discussion of a particular assignment of error.

Porter was carrying a concealed, nine-millimeter Jennings semi-automatic pistol. The two men entered the apartment of Valorie Arrington, where several people were present, including Valorie and her daughters, Latoria and Latifa; Valorie's cousins, Monica Dickens and April Phillips; Valorie's sister, Monique Arrington, also known as Monika; and Monique's daughter, Lamia.

Once inside, Porter began arguing with the women, brandishing his gun, and threatening that he might shoot one of them if provoked. Copeland left the residence, but Porter remained behind, locking the door so Copeland could not reenter. After being locked out of Valorie's apartment, Copeland walked away from the apartment complex and happened upon three uniformed police officers a block away, including Norfolk Police Officer Stanley Reaves. Copeland reported Porter's behavior to Officer Reaves and directed him to Valorie's apartment.

Officer Reaves drove his police cruiser to the front curb of the apartment building, parked the car, and walked across the grass towards the sidewalk leading from the street to the apartment door. As Officer Reaves approached the apartment, Porter left Valorie's apartment and began walking away. Officer Reaves confronted Porter, grabbed Porter's left arm, and instructed him to take his hands out

3

of his pockets.  Porter then drew his concealed weapon from his pocket and fired three times, killing Officer Reaves.  Porter took Officer Reaves' service pistol and then fled in his Jeep.

Several eyewitnesses, along with Porter, testified at trial and provided various descriptions of the events leading up to and immediately following Officer Reaves' death.  Copeland testified that he was standing in a parking lot on the afternoon of Officer Reaves' death when Porter approached him.  They decided to get into a Jeep Grand Cherokee that Porter was driving and go to Valorie's apartment to purchase marijuana.

Copeland testified that he and Porter entered Valorie's apartment because she was Copeland's friend and because he had smoked marijuana with her before.  Once inside, they met Valorie and the other women who informed Copeland and Porter that they did not have any marijuana. The group then talked about various subjects, including a child's birthday party, but at some point in the conversation Porter began arguing with one of the women.

Copeland "didn't know what to do" but left the apartment and "ran down [to the next block] and told [Officer Reaves, ']Look, there is a man up in the house with some girls, and he shouldn't be in there.'"  Copeland

described the apartment building to Officer Reaves, and Officer Reaves drove his patrol car to the building with Copeland "running behind" the vehicle. Officer Reaves arrived at the building before Copeland, and as Copeland approached he saw "Officer Reaves in the car and Porter was coming out [of] the building." Copeland identified Porter to Officer Reaves, and Officer Reaves instructed Copeland to stay back and then approached Porter. Moments later, Porter and Officer Reaves disappeared from Copeland's viewpoint behind a parked van, but Copeland "heard gunshots and started running," and he "ran and told the [other] officers what happened."

Melvin Spruill, Jr., owner of the apartment complex, testified that he was picking up trash in the yard, when he "noticed a police car sitting on the corner" parked directly behind his van. Spruill entered his van and was preparing to leave when he noticed Officer Reaves talking with Porter. "[O]ut of the corner of [his] eye" Spruill saw Porter's hands drop down, raise up again with a gun, and then he heard a gunshot. Spruill ducked and "heard another shot . . . [, m]aybe two shots," and then saw Porter run away. Spruill testified that he never saw Officer Reaves holding a gun, nor did he hear arguing between the two men before Porter shot Officer Reaves.

5

Simone Coleman testified that she was walking on the sidewalk near the apartment complex when she saw Officer Reaves' patrol car arrive. Coleman watched as Officer Reaves stepped out of his patrol car, and she saw Porter walking across the grass from the apartment, coming to "within a few feet" of her. She testified that Porter's hands were "[i]n his pockets" as Coleman passed by, and she "was looking back" to watch the confrontation between Officer Reaves and Porter. Coleman heard Officer Reaves instruct Porter to "take his hands out of his pockets," and then Officer Reaves "grabbed Mr. Porter's left arm." Coleman testified that Officer Reaves "didn't have a gun out," and that Porter, in response to Officer Reaves grabbing his arm, pulled a gun out of his pocket, pointed the gun at Officer Reaves' head, and pulled the trigger. Coleman watched Officer Reaves collapse to the ground, and she testified that Porter then shot Officer Reaves two more times. Coleman identified Porter in court as the man who killed Officer Reaves.

Selethia Anderson, who lived across the street from the apartment complex, was sitting on her front porch when she saw Officer Reaves arrive. Anderson testified that she watched Officer Reaves exit his vehicle and walk towards Porter as Porter was leaving the apartment complex. She

6

described how Officer Reaves confronted Porter and "used his right hand to grab [Porter's] left hand," and then Porter immediately reached into his hoodie pocket with his right hand, pulled out a gun, and shot Officer Reaves in the head. Anderson testified that after Officer Reaves fell, Porter shot him twice more "between the back of the head and neck." According to Anderson, Porter knelt over Officer Reaves' body after the shooting, and when Porter left the scene, he was carrying a "bigger gun" than the one he had used to shoot Officer Reaves. Anderson identified Porter in court as the man who shot Officer Reaves.

Valorie testified that she was in her apartment that afternoon when Copeland arrived with Porter. According to Valorie, the two men "came for some marijuana" but the women did not have any, and asked the men to leave. Copeland agreed to leave, but Porter stayed inside, locked the door and kept Copeland outside. Valorie testified that she felt scared because Porter had "locked us in our own house." Valorie asked Porter why his hands were in his sweatshirt pocket, and Porter responded by pulling out his gun and asking, "[s]o are you going to give me the bag of weed or what?" Valorie testified that she uttered a prayer, and when Porter realized she was a Muslim, he told the women that they were "lucky" and he put away the gun.

7

When Porter realized a police car had arrived, he left the apartment and ran "like some horses going down the stairs." Moments later, Valorie heard gunshots.

Latoria's testimony confirmed that Porter entered Valorie's apartment along with Copeland, and that Copeland left the apartment but Porter remained inside, locking the door. Latoria testified that Porter threatened that he would "get to clapping" if any of the women made a sudden move, and she explained that "clapping" was a term for "shooting." She testified that she looked out the window, noticed Officer Reaves arrive in his patrol car, and asked, "Why is Reggie [Copeland] talking to the police officer?" Latoria testified that Porter then immediately exited the apartment, and she watched through the window as Officer Reaves approached Porter, grabbed Porter's arm, and then Porter "reach[ed] into his right pocket and he pull[ed] out his gun and he shot him." Latoria testified that Officer Reaves did not have a weapon drawn when Porter shot him.

Dickens' testimony confirmed Valorie's and Latoria's accounts of the confrontation in Valorie's apartment between Porter and the women. Dickens testified that Porter threatened to "get to clapping" if any of the women began "talking smack." Dickens explained that she "was just real afraid right then for my whole family." Dickens

8

testified that Porter left the apartment immediately when he learned that a police car had arrived, and she went to the window to watch what was happening. Dickens watched Officer Reaves approach Porter, grab Porter's arm, and then Porter "put the gun to his head" and shot Officer Reaves.[4]

Monika also testified that Porter entered Valorie's apartment with Copeland but stayed inside and locked the door after Copeland left. Monika confirmed that Porter threatened to "get it clapping in here with all y'all" and explained that "'[c]lapping' means you shoot somebody." Monika testified that when Porter learned that a police vehicle had arrived outside, he left the apartment immediately and began walking away. Monika testified that she watched out the window as "[t]he police officer grabbed Porter's arm," and Porter "pulled the gun out of his pocket and put it to [Officer Reaves'] forehead," and pulled the trigger. Monika testified that Officer Reaves "never drew his weapon. He got out of his car and walked over to Porter as if he just wanted to talk to him and that was it."

Robert Vontoure, a Navy seaman who lived across the street from where the shooting occurred, testified that he

---

[4] Dickens was never questioned as to whether she saw Officer Reaves draw his weapon.

arrived home from work and noticed a Jeep which he did not recognize parked outside his home. Vontoure explained that he was in his home, "sitting there watching TV and . . . heard gunshots." Vontoure looked outside the window "and saw a gentleman coming running across our lawn, jump into the Jeep and leave." Vontoure identified Porter in court as the man who fled the scene in the Jeep vehicle.

After killing Officer Reaves, Porter traveled to New York City where he was apprehended one month later in White Plains, New York. The murder weapon was found in his possession at the time of his arrest. Officer Reaves' gun was eventually located in Yonkers, New York.

The autopsy report revealed that Officer Reaves suffered three close-range wounds to his head: one to the forehead, one to the left back of the head, and a flesh wound near the right ear. "The cause of death was two separate close range gunshot wounds to the head."

Porter did not dispute that he shot Officer Reaves, but his version of the events differed from that of the eyewitnesses. Porter testified in his own defense that he drove to Valorie's apartment with Copeland "[t]o get a bag of marijuana" because Copeland was his "means of getting marijuana." Porter parked the vehicle outside the apartment, and he "grabbed the gun out of the glove

10

compartment box" before leaving the vehicle "[b]ecause the area . . . is a bad area." Porter testified that he gave Copeland $10 to purchase marijuana, and that he waited outside while Copeland went inside to make the purchase.

Porter testified that after a few minutes had passed, Copeland emerged from an upstairs apartment and invited him inside. Porter confirmed that Copeland left the apartment, but Porter denied locking the door and keeping Copeland outside. Porter also denied brandishing his gun inside the apartment or making a statement about shooting any of the women. Porter claimed that he left the apartment when he learned from the women that Copeland had not paid them for marijuana, and he denied that any of the women knew about Officer Reaves' arrival because "[w]asn't nobody even looking out the window."

Porter testified that he left the apartment and was walking to his vehicle "when Officer Reaves stepped in front of me and grabbed me." Porter and his counsel then had the following exchange:

Q. Did anything else happen when he did that?

A. Yes. I seen him pulling his gun.

Q. What do you mean, you saw him pulling his gun?

A. Well, when he grabbed me with his left arm on my left arm, we were still standing face to

11

face. I seen him pulling his gun. That's when I put my hands up in the air and backed up, looking at him, like, "What [are] you doing?"

Q. You just described that you put your hands up in the air?

A. Yes.

Q. And at that point, what happened?

A. Well, I got my hands in the air when he finally gets the gun out and point it at me. I take my hands down and pull my gun and started shooting.

Q. Why did you do that, Mr. Porter?

A. Because I was scared. I thought he was going to kill me because he looked angry at the time, so I was just worried for my safety.

Porter testified on direct examination that he could not remember how many times he pulled the trigger, but after he shot Officer Reaves, he bent down, picked up Officer Reaves' gun and ran. Porter explained that he left the scene because he "was scared" because he realized he "just killed an officer."

Porter testified repeatedly on cross-examination that he "never wanted to kill anybody" but he also admitted that he "pulled out the gun" and "shot [Officer Reaves] in the forehead." Porter and opposing counsel had this exchange on cross-examination:

Q. You meant to hit Stanley Reaves with a bullet, didn't you?

12

A.    Yes, sir.

Q.    All right.  And you took aim – therefore, you took aim at him, correct?

A.    Yes, sir.

Q.    You took aim at a part of his body, correct?

A.    Yes, sir.

Q.    And the part of his body that you took aim at and then before pulling the trigger from less than six inches away was directly into his forehead, correct?

A.    Yes, sir.

                    .  .  .  .

Q.    And you agree that you knew you were aiming at his head, correct?

A.    Yes, sir.

Porter also had this exchange on cross-examination:

Q.    You admit that you . . . pulled your gun out?

A.    Yes, sir.

Q.    And that you shot him in the head?

A.    Yes, sir.

Q.    You admit that you stole his gun?

A.    Yes, sir.

Q.    So according to your version of events, you claim that Officer Reaves pulled his gun, correct?

A.    Yes.

13

Q.    And the only thing about the crime that's alleged you committed, the capital murder of Officer Stanley Reaves, using a gun to commit that murder and stealing Officer Reaves' gun, the only part of the crime that we're here that you're on trial for that you dispute, really, is the reason why you shot Officer Reaves; is that correct?

A.    Yes.

### B.    PROCEEDINGS BEFORE AND DURING TRIAL

Porter filed a motion before trial for a change of venue, to which the Commonwealth consented.  The circuit court, Judge Charles D. Griffith presiding, entered an order granting the motion and a subsequent order "that the trial of the above referenced case be transferred to the Circuit Court of the Fourth Judicial Circuit located in Arlington, Virginia."  The circuit court also granted Porter's motion to appoint William J. Stejskal, Ph.D., as a mitigation expert "to evaluate the Defendant and to assist the defense in accordance with the provisions of Code § 19.2-264.3:1."  Similarly, the circuit court granted Porter's motion and appointed Bernice Anne Marcopulos, Ph.D., ABPP-Cn, as a clinical neuropsychologist expert to assist the defense.

The Commonwealth filed a motion in limine requesting that evidence of Porter's prior felony convictions be admissible during the guilt stage of the trial.  The

Commonwealth requested to present the evidence that Porter "knew he [Porter] was a convicted felon who faced the prospect of being sent to prison for five (5) years should Officer Stanley Reaves . . . have discovered the defendant to have been in possession of a firearm while a felon." Over Porter's objection, the circuit court granted the Commonwealth's motion permitting the introduction of evidence during the trial that Porter was a "convicted violent felon."

On January 5, 2007, Porter filed a "Motion for Appointment of Expert on Prison Risk Assessment and to Introduce Evidence on Prison Violence and Security" ("Prison Expert Motion"), requesting that the circuit court appoint Dr. Mark Cunningham as "an expert on the assessment of the risk of violence by prison inmates and, in particular, the risk of future dangerousness posed by the Defendant if incarcerated in a Virginia penitentiary for life." The court heard arguments on the motion and determined that the other experts already appointed "are going to be able to talk about [Porter's] background, his social history and things relating to that." The circuit court noted that this Court "has consistently upheld the denial of use of public funds for such an expert, as it's not considered to be . . . proper mitigation evidence;

15

therefore not relevant to capital sentencing" and denied the motion. Porter also filed a motion challenging the constitutionality of Virginia's execution protocols for lethal injection and electrocution, which the court denied.

Porter's trial, with Judge Griffith presiding, commenced in Arlington County on February 26, 2007, and continued through March 14, 2007. On the afternoon of March 2, 2007, Porter objected to the position of two deputies who had been standing about four feet behind him, arguing that their presence standing, as opposed to sitting, prejudiced the jury. Porter subsequently filed a written motion and memorandum in support challenging the courtroom security arrangement. After hearing Porter's motion, the circuit court noted that Porter had previously resisted deputies' instructions while in custody and had tampered with his restraints. The court found that sitting would reduce the deputies' field of vision, and declined to order them to be seated. Porter later raised the issue for a third time and moved for a mistrial, which the court denied.

Upon presentation of all the evidence at the guilt stage, the parties argued jury instructions. Porter proposed a "second-degree murder instruction directly out of the model jury instructions" based on evidence that

Porter shot Officer Reaves "in rapid succession, boom, boom, boom," and "that this act was not premeditated." The Commonwealth argued that the court should refuse the second-degree murder instruction because Porter's "own testimony is that he willfully and purposely and with deliberation pulled the gun out and aimed it at Officer Reaves and fired it." The court denied Porter's requested instruction.

## C.  PENALTY PHASE

During the penalty stage of the proceedings, the Commonwealth presented evidence in aggravation, which included Porter's prior convictions of misdemeanor carrying a concealed weapon in 1994, felony robbery and use of a firearm during the commission of a felony in 1994, misdemeanor disturbing the peace, misdemeanor assault and battery and misdemeanor threatening a police officer and resisting arrest in 1996, felony possession of heroin, felony possession of a firearm with drugs, and felony possession of a firearm by a convicted felon in 1997, misdemeanor assault and battery in 1997, and misdemeanor obstruction of justice in 2005. The Commonwealth presented evidence of several incidents while Porter was incarcerated, including altercations between Porter, fellow inmates, and prison guards. The Commonwealth also

17

introduced audiotapes of portions of two telephone conversations between Porter and an unidentified female recorded during Porter's incarceration, which the Commonwealth introduced because they "are directly relevant to the issue of the defendant's lack of remorse" and included Porter bragging that he was a "good shot."

The Commonwealth also introduced the testimony of Officer Reaves' wife and sister, and each described the devastating impact of Officer Reaves' death upon his extended family. Porter presented mitigation evidence which included testimony of his mother and sister as to his childhood, family life and educational background.

The jury's verdict found "unanimously and beyond a reasonable doubt, after consideration of his history and background, that there is a probability that he . . . would commit criminal acts of violence that would constitute a continuing serious threat to society," and sentenced Porter to death. After receipt of the presentence report, the circuit court confirmed the jury's verdict and sentenced Porter to death for the capital murder of Officer Reaves.

## II. ANALYSIS

### A. ABANDONED ASSIGNMENTS OF ERROR

Prior to filing his opening brief, Porter submitted a list of twenty-one assignments of error in accord with Rule

5:22(b).  However, only nine of those assignments of error have been briefed and argued by Porter.[5]  Accordingly, the other twelve assignments of error have been abandoned and will not be considered in this opinion.  Rule 5:17(c); see also Teleguz v. Commonwealth, 273 Va. 458, 471, 643 S.E.2d 708, 717 (2007).  In this opinion, we will refer to the nine assignments of error as numbered in Porter's Brief of Appellant.

### B.  JURISDICTION UPON TRANSFER

Before addressing Porter's assignments of error, we first consider an issue raised sua sponte by this Court and addressed by the parties in supplemental briefs and argument.  Based on our review of the record, we inquired whether the transfer of Porter's trial to Arlington (and the subsequent transfer back to Norfolk after the jury's verdicts) created issues of either subject matter or territorial jurisdiction that would affect the judgments rendered by the circuit court.

Well in advance of trial, Porter filed a motion in the Circuit Court of the City of Norfolk requesting a change of venue and to which the Commonwealth agreed.  The circuit

---

[5] As numbered in Porter's initial assignments of error, Porter has failed to present any brief or argument with respect to assignments of error 1, 2, 3, 4, 10, 11, 12, 14, 15, 18, 19, and 20.

19

court then entered an order on September 13, 2006, which granted a "change of venue" but did not specify a new location for trial. On October 2, 2006, the circuit court entered another order which "orders that the trial of the above-referenced case be transferred to the circuit court of the Fourth Judicial Circuit located in Arlington, Virginia." The Circuit Court of the County of Arlington ("Arlington") is the Seventeenth Judicial Circuit. The Fourth Judicial Circuit is limited to the City of Norfolk ("Norfolk"). It is unclear from the circuit court's order whether it was transferring the place of trial with the Norfolk Circuit Court sitting in Arlington or whether it was intended that the trial be conducted in Arlington as a trial in that circuit. Subsequent to these orders, a number of additional orders were entered in Norfolk under the caption of the Norfolk Circuit Court;[6] none of these orders related to the change of venue.

---

[6] These comprise 11 orders, including: an order entered October 23, 2006, denying Porter's motion to quash a subpoena duces tecum and granting a motion in limine by the Commonwealth; an order for scientific investigation also entered October 23, 2006; an order entered November 3, 2006, granting funding for defense counsel's and Porter's witnesses' hotel accommodations in Arlington; an order entered January 8, 2007, appointing Porter's neuropsychologist; an order entered January 16, 2007, granting Porter's motion for additional neuropsychological evaluation but denying his motions to distribute a jury questionnaire, to suppress, and to allow cameras in the

Porter's trial began in Arlington, with Judge Griffith sitting as the trial judge, on February 26, 2007. A series of "felony trial orders" were entered, all with the caption "In the Circuit Court of the County of Arlington," and reflecting the trial proceedings from February 26 to March 14. However, all these orders were entered on the same date, July 13, 2007, on stationery of the Clerk of the Circuit Court of Norfolk.[7]

The felony trial orders recited the trial proceedings on the respective dates and none were endorsed by counsel.

courtroom; an order denying Porter's motion to prohibit law enforcement spectators from wearing their uniforms in the gallery also entered January 16, 2007; three orders for the transportation of witnesses in custody entered January 18 and February 22, 2007; an order entered February 13, 2007, granting Porter's motion for the appointment of a qualified mental health expert; and an order entered February 16, 2007, denying Porter's motion to declare the death penalty unconstitutional, taking under advisement his motion to enjoin the Commonwealth from conducting lethal injections, and granting his proposed voir dire questions.

[7] These comprise 13 orders, dated February 26 through 28; March 1 and 2; March 5 through 9; and March 12 through 14, 2007. Each order summarizes that day's trial proceedings and all but four are unremarkable. The order dated February 26 recounts Porter's arraignment and the voir dire and empanelling of the jury. The order dated March 7 recounts the jury's verdict of guilty on the charges of capital murder, use of a firearm in the commission of a felony, and grand larceny. The order dated March 8 recounts the jury's sentencing recommendation on the charges of use of a firearm in the commission of a felony and grand larceny. The order dated March 14 recounts the jury's recommendation of the death sentence on the charge of capital murder and continues proceedings to the Circuit Court of Norfolk on July 16.

These orders included an order of March 7, 2007, which set out the jury's verdict of guilty on the charge of capital murder as well as a March 14, 2007, order reciting the jury's sentence of death.  In that same March 14, 2007, order, the circuit court confirmed the jury verdict and found Porter guilty of capital murder, but also granted his motion "to refer this matter to the Probation Office for the Circuit Court of Norfolk, Virginia" and continued the case to July 16, 2007 "in the Circuit Court of the City of Norfolk."  All remaining orders in the record reflect the caption of the Circuit Court of the City of Norfolk including the July 18, 2007 order sentencing Porter to death.

At no place does the record reflect that Porter questioned or inquired into the circuit court's authority to sit in Arlington, to try the case in Arlington, or to undertake any of the later proceedings in Norfolk.  More importantly, Porter has never objected to any defect, real or imagined, relating to the circuit court's jurisdiction or authority to act in either Arlington or Norfolk.  In fact, during the course of the trial in Arlington, Porter filed five motions captioned "In the Circuit Court of

Norfolk County [sic] (sitting in Arlington County)."[8]  There

can be no question that Porter was fully cognizant of, and

actively participated in, a trial in Arlington pursuant to

his motion to change venue, which he knew was being

conducted by the same circuit court judge who began (and

concluded) the case in Norfolk.

The record does not contain an order under Code

§ 17.1-105, or otherwise, designating Judge Griffith to sit

in the Circuit Court of Arlington County.  The record also

does not contain an order, as would appear to be required

by Code § 19.2-253, whereby the Clerk of the Circuit Court

of the City of Norfolk transmitted the record in Porter's

case to the Clerk of the Circuit Court of Arlington County

so that "such court shall proceed with the case as if the

prosecution had been originally therein."

With this factual background in mind, Porter now

argues in response to our inquiry that the judgments of

conviction and sentence are void because "the provisions of

§ 17.1-105 are mandatory and limit a court's otherwise

rightful exercise of its subject matter jurisdiction."

Porter cites our decision in Moore v. Commonwealth, 259 Va.

---

[8] These comprise Porter's motion for relief from
excessive in-court security, with accompanying memorandum
in support, and four memoranda in support of his motions
requesting jury instructions.

23

431, 527 S.E.2d 406 (2000) to support his argument. The Commonwealth responds by noting that Code § 17.1-513 grants subject matter jurisdiction in felony cases to all circuit courts and argues the Norfolk Circuit Court was never divested of that authority. Consequently, the Commonwealth concludes the orders of the circuit court could not be void, but at most voidable, and that Porter has waived any objections to voidable orders.

Upon consideration of the arguments, briefs and our precedent, we conclude that a lack of subject matter jurisdiction is not implicated in this case and that any irregularities as to the circuit court's authority raised at most an issue of territorial jurisdiction, which was waived by Porter's failure to timely object to any such defect.

Jurisdiction is a term which can engender much confusion because it encompasses a variety of separate and distinct legal concepts. We addressed this topic and differentiated the categories of jurisdiction in Morrison v. Bestler, 239 Va. 166, 387 S.E.2d 753 (1990).

> A court may lack the requisite "jurisdiction" to proceed to an adjudication on the merits for a variety of reasons.
>
> The term jurisdiction embraces several concepts including subject matter jurisdiction, which is the authority granted through

24

constitution or statute to adjudicate a class of cases or controversies; territorial jurisdiction, that is, authority over persons, things, or occurrences located in a defined geographic area; notice jurisdiction, or effective notice to a party or if the proceeding is *in rem* seizure of a *res*; and "the other conditions of fact must exist which are demanded by the unwritten or statute law as the prerequisites of the authority of the court to proceed to judgment or decree." Farant Inv. Corp. v. Francis, 138 Va. 417, 427-28, 122 S.E. 141, 144 (1924).

While these elements are necessary to enable a court to proceed to a valid judgment, there is a significant difference between subject matter jurisdiction and the other "jurisdictional" elements. Subject matter jurisdiction alone cannot be waived or conferred on the court by agreement of the parties. Lucas v. Biller, 204 Va. 309, 313, 130 S.E.2d 582, 585 (1963). A defect in subject matter jurisdiction cannot be cured by reissuance of process, passage of time, or pleading amendment. While a court always has jurisdiction to determine whether it has subject matter jurisdiction, a judgment on the merits made without subject matter jurisdiction is null and void. Barnes v. American Fert. Co., 144 Va. 692, 705, 130 S.E. 902, 906 (1925). Likewise, any subsequent proceeding based on such a defective judgment is void or a nullity. Ferry Co. v. Commonwealth, 196 Va. 428, 432, 83 S.E.2d 782, 784 (1954).

Even more significant, the lack of subject matter jurisdiction can be raised at any time in the proceedings, even for the first time on appeal by the court *sua sponte*. Thacker v. Hubard, 122 Va. 379, 386, 94 S.E. 929, 930 (1918). In contrast, defects in the other jurisdictional elements generally will be considered waived unless raised in the pleadings filed with the trial court and properly preserved on appeal. Rule 5:25.

One consequence of the non-waivable nature of the requirement of subject matter jurisdiction

25

is that attempts are sometimes made to mischaracterize other serious procedural errors as defects in subject matter jurisdiction to gain an opportunity for review of matters not otherwise preserved.  See Restatement (Second) of Judgments, § 11 (1980).

Id. at 169-70, 387 S.E.2d at 755-56.

Our recitation in Morrison reflects the long-standing distinction between subject matter jurisdiction, which cannot be granted or waived by the parties and the lack of which renders an act of the court void, and territorial jurisdiction or venue.  The latter goes to the authority of the court to act in particular circumstances or places and is waived if not properly and timely raised.  The judgment of a court which is defective in territorial jurisdiction or venue is thus only voidable and not void.  Id.; Southern Sand and Gravel Company, Inc. v. Massaponax Sand and Gravel Corporation, 145 Va. 317, 326, 133 S.E. 812, 814 (1926).

All the circuit courts of the Commonwealth "have original jurisdiction of all indictments for felonies and of presentments, informations and indictments for misdemeanors."  Code § 17.1-513.  As we recognized in Garza v. Commonwealth, 228 Va. 559, 323 S.E.2d 127 (1984), this statute means what it says.  "[A]ll circuit courts have jurisdiction over all felonies committed in the Commonwealth."  Id. at 566, 323 S.E.2d at 130.  Thus, both

26

the Norfolk Circuit Court and the Arlington Circuit Court had subject matter jurisdiction for the trial of the charges against Porter.

Even though Porter did not raise the argument, we note that the grant of subject matter jurisdiction under Code § 17.1-513 is not limited by Code § 19.2-239, which sets forth that "[t]he circuit courts, except where otherwise provided, shall have exclusive original jurisdiction for the trial of all presentments, indictments and informations for offenses committed within their respective circuits." (Emphasis added.) The jurisdiction referenced in Code § 19.2-239 is a grant of territorial jurisdiction, not the subject matter jurisdiction conferred under Code § 17.1-513.

We reach this conclusion for at least two reasons. First, if Code § 19.2-239 dealt with subject matter jurisdiction, such a construction would render the Code § 17.1-513 grant of "original jurisdiction of all . . . felonies" to all circuit courts to be meaningless and superfluous. Such a statutory construction is to be avoided. "The rules of statutory interpretation argue against reading any legislative enactment in a manner that will make a portion of it useless, repetitious, or absurd. On the contrary, it is well established that every act of

27

the legislature should be read so as to give reasonable effect to every word . . . ." Jones v. Conwell, 227 Va. 176, 181, 314 S.E.2d 61, 64 (1984). "[E]very part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary." Hubbard v. Henrico Ltd. P'ship, 255 Va. 335, 340, 497 S.E.2d 335, 338 (1998).

In addition, Code § 19.2-239 contains the clear proviso "except where otherwise provided." The change of venue statute, Code § 19.2-251, "otherwise provide[s]," and venue was changed in this case. As a matter of law, venue cannot be an issue of subject matter jurisdiction, and that "otherwise provided" example confirms Code § 19.2-239 could not encompass subject matter jurisdiction. "Venue and jurisdiction, though sometimes confounded, are, accurately speaking, separate and distinct matters. Jurisdiction is authority to hear and determine a cause, or it may be defined to be the right to adjudicate concerning the subject matter in the given case. . . . Venue is merely the place of trial . . . ." Texaco, Inc. v. Runyon, 207 Va. 367, 370, 150 S.E.2d 132, 135 (1966) (internal quotation marks omitted).

Thus, while both the Arlington and Norfolk circuit courts had subject matter jurisdiction over Porter's

28

charges under Code § 17.1-513, the authority to conduct that trial, that is, the territorial jurisdiction authorizing the court to adjudicate among the parties at a particular place, was initially in the Norfolk Circuit Court, as the place of the offense, under Code § 19.2-239. Nonetheless, if trial was had in Arlington, so that a violation of Code § 19.2-239 occurred, that defect went solely to the circuit court's lack of authority to exercise territorial jurisdiction and is waived if not timely raised. See Morrison, 239 Va. at 169-70, 387 S.E.2d at 755-56; Southern Sand and Gravel, 145 Va. at 326, 133 S.E. at 814; Gordon v. Commonwealth, 38 Va. App. 818, 822-23, 568 S.E.2d 452, 453-54 (2002).[9]

Porter asked for the change of venue he duly received. When offered the opportunity to move from Arlington, when the trial began, Porter specifically declined to do so. After the jury's verdicts, Porter specifically requested the transfer back to Norfolk, which the circuit court duly

---

[9] We also note the language in Code § 17.1-503(B) that "[n]o rule shall . . . preclude the judge before whom an accused is arraigned in criminal cases from hearing all aspects of the case on its merits, or to avoid or preclude any judge in any case who has heard any part of the case on its merits from hearing the case to its conclusion." This statutory language reflects a policy preference of the General Assembly that the judge sitting when Porter's case commenced (in this case Judge Griffith), be the judge who concludes trial of the case even if venue of the trial is

granted.  Until raised by this Court, Porter never objected to or questioned in any way the exercise of the circuit court's authority or any potential defects in that authority by virtue of conducting proceedings in either Arlington or Norfolk.  Porter clearly failed to raise an objection under Code § 19.2-244, which requires "questions of venue to be raised before verdict."  Code § 19.2-244. Porter received exactly what he requested in terms of a different venue for his trial.  He cannot take a different position at this point without violating our rule prohibiting approbation and reprobation.  Cangiano v. LSH Bldg. Co., 271 Va. 171, 181, 623 S.E.2d 889, 895 (2006) ("A party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory"); see also Powell v. Commonwealth, 267 Va. 107, 144, 590 S.E.2d 537, 560 (2004); Cohn v. Knowledge Connections, Inc., 266 Va. 362, 367, 585 S.E.2d 578, 581 (2003); Smith v. Settle, 254 Va. 348, 354, 492 S.E.2d 427, 431 (1997); Leech v. Beasley, 203 Va. 955, 961-62, 128 S.E.2d 293, 297-98 (1962).

Nonetheless, Porter contends the circuit court's judgment was void, thus requiring reversal and a new trial,

altered.

30

based on his reading of Code § 17.1-105 as a mandatory limit on a circuit court's subject matter jurisdiction.[10] To support that position, Porter relies on Moore and Gresham v. Ewell, 85 Va. (10 Hans.) 1, 6 S.E. 700 (1888). Porter contends these cases establish precedent that a judicial act is void, not voidable, when a lack of proper designation of the trial judge occurs. We disagree.

We initially note some doubt that Code § 17.1-105 applies in the circumstance of a change of venue.[11] On its

_____

[10] Porter does not address and we do not reach the constitutional authority of the Chief Justice of Virginia to assign judges for the administration of justice. Va. Const. art. VI, § 4. We do note that there is no constitutional or statutory basis for the implication in the dissent that a designation by the Chief Justice of Virginia, or a circuit court judge, under Code § 17.1-105 could somehow convey subject matter jurisdiction, as is amply illustrated by the lack of any citation to precedent for that proposition in the dissenting opinions. Clearly, subject matter jurisdiction comes only by constitutional or statutory provision. Morrison, 239 Va. at 169, 387 S.E.2d at 755.

[11] Code § 17.1-105(A) and (B) state as follows:

> A. If a judge of any court of record is absent, sick or disabled or for any other reason unable to hold any regular or special term of the court, or any part thereof, or to perform or discharge any official duty or function authorized or required by law, a judge or retired judge of any court of record may be obtained by personal request of the disabled judge, or another judge of the circuit to hold the court for the whole or any part of such regular or special term and to discharge during vacation such duty or function, or, if the circumstances require, to perform all the duties and exercise

31

face, Code § 17.1-105(A) appears directed at those instances where illness, disability, or other similar disqualifying circumstance necessitates a judge from another circuit to sit in the affected jurisdiction. Code § 17.1-105(B) appears directed at conflicts of interest which require recusal of all the judges in the circuit and necessitates a judge from another jurisdiction to sit. None of the circumstances indicated in Code § 17.1-105 occurred in this case. Furthermore, nothing on the face of Code § 17.1-105 references a judicial designation when there is a change of venue.

However, it is unnecessary for us to resolve whether Code § 17.1-105 may have applied in this case and a

all the powers and jurisdiction as judges of such circuit until the judge is again able to attend his duties. The designation of such judge shall be entered in the civil order book of the court, and a copy thereof sent to the Chief Justice of the Supreme Court. The Chief Justice shall be notified forthwith at the time any disabled judge is able to return to his duties.
B. If all the judges of any court of record are so situated in respect to any case, civil or criminal, pending in their court as to render it improper, in their opinion, for them to preside at the trial, unless the cause or proceeding is removed, as provided by law, they shall enter the fact of record and the clerk of the court shall at once certify the same to the Chief Justice of the Supreme Court, who shall designate a judge of some other court of record or a retired judge of any such court to preside at the trial of such case.

designation order should have been entered for Judge Griffith to sit in Arlington.  We can assume, without deciding, that if Code § 17.1-105 was applicable when venue changed in this case, a missing order of designation would only have affected the circuit court judge's authority to act in the exercise of territorial jurisdiction.  As noted earlier, that issue is waived if not timely raised.  Porter made no objection to the circuit court judge's purported lack of authority under Code § 17.1-105 and he cannot now attack the circuit court's judgment on that basis.  Rule 5:25.

Porter's citations to Moore and Ewell are similarly unpersuasive.  In Moore, the defendant argued his prior juvenile court proceedings were void because the statutory directive to give notice to both his parents was absent from the record.  259 Va. at 434, 527 S.E.2d at 407.  Porter contends that Code § 17.1-105 is like the juvenile notice statute at issue in Moore, which the majority of the court held was "mandatory in nature and limit[s] a court's rightful exercise of its subject matter jurisdiction."  259 Va. at 438, 527 S.E.2d at 409.  The Court in Moore concluded the lower court "never acquired the authority to exercise its jurisdiction."  Id. at 440, 527 S.E.2d at 411.  Even though the juvenile court's subject matter

33

jurisdiction was not at issue, the defendant was permitted to collaterally attack the underlying judgment because the majority found it void, not voidable. The dissenting opinion in Moore, foreshadowing our decision in Nelson v. Warden, 262 Va. 276, 552 S.E.2d 73 (2001), noted that "the majority incorrectly equates statutory provisions that are 'mandatory' with those that are prerequisites to a juvenile court's exercise of its subject matter jurisdiction. . . . The mandatory nature of a requirement, standing alone, does not always make that requirement jurisdictional." 259 Va. at 446, 527 S.E.2d at 414-15 (J. Kinser, dissenting).

However, Porter's reliance on Moore is misplaced because we specifically overruled that case in Nelson. The resolution of Nelson reflects the frailty of Porter's position because the defendant in Nelson lost on the same statutory notice defect Moore was allowed to raise, specifically because the view that the defect was an unwaivable jurisdictional defect (a premise in Moore) was overruled in Nelson. Thus the pertinent comparison is between the defendant Baker in the seminal parental notification decision in Commonwealth v. Baker, 258 Va. 1, 516 S.E.2d 219 (1999) (per curiam), affirming Baker v. Commonwealth, 28 Va. App 306, 504 S.E.2d 394 (1998), who made timely objection throughout the proceedings – making

the defects cognizable on appeal – and the defendant in

Nelson, who failed to timely raise the claim at trial.

Nelson overruled Moore on the point that the failure to

object was a waiver of the argument given the non-

jurisdictional nature of the failure to adhere to the

statutory requirement, thus vitiating Porter's reliance on

this theory.

In Nelson, we embraced the dissent in Moore and

acknowledged that the majority's analysis in Moore "is

flawed" and stated:

> After noting the Court's emphasis on the
> distinction between subject matter jurisdiction
> and the authority to exercise that jurisdiction,
> the Court's next step should have been to
> demonstrate the difference resulting from the
> distinction.  Yet, we made a distinction without
> a difference for, with our very next step, we
> elevated the failure of a court to comply with
> the requirements for exercising its authority to
> the same level of gravity as a lack of subject
> matter jurisdiction.

262 Va. at 281, 552 S.E.2d at 75.  We then stated:

> We indicated *supra* that we thought a different
> outcome could have resulted in David Moore from
> the distinction we drew between subject matter
> jurisdiction and the authority to exercise that
> jurisdiction.  In our opinion, the different
> outcome should have consisted of a finding that
> the statutory requirement of notice to parents
> was not jurisdictional but procedural in nature,
> that a failure to notify parents could be waived
> by a failure to object, and, correspondingly,
> that a failure to comply with the requirement
> rendered subsequent convictions voidable and not

35

> void.  To the extent David Moore conflicts with
> these views, it is overruled.

262 Va. at 284-85, 552 S.E.2d at 77.

Porter contends the failure to follow Code § 17.1-105 and obtain a designation order for the conduct of his case in Arlington and the return to Norfolk caused the circuit court's judgments to be void because the court lacked the authority to exercise its otherwise valid subject matter jurisdiction.  As just illustrated, we specifically rejected that argument in Nelson when we overruled Moore.  Thus, the circuit court had subject matter jurisdiction over Porter's trial which was never affected by the transfer of venue and its judgments could not be void on that basis.  If a defect in the circuit court's exercise of its authority occurred, it was subject to waiver, and that is what happened in the case at bar.  While the circuit court's judgment may have been subject to a timely objection, and thus have been a voidable judgment, Porter's failure to object settles the issue.

Porter's citation to Ewell is similarly unavailing.[12] Ewell involved a judgment our predecessors determined to be

---

[12] At the time of the Ewell decision, the Supreme Court of Appeals consisted of only five members.  Va. Const. art. VI, § 2 (1870).  A bare quorum of the Court, three members, id., sat in the Ewell case so the majority opinion was rendered by a plurality of only two members of the Court.

"null and void" because a judge from another jurisdiction rendered that judgment without a proper designation to conduct court in the jurisdiction where trial occurred. 85 Va. at 2, 6 S.E. at 701. However, as pointed out by the dissent in Ewell, the majority's underlying analysis suffers from the same fatal flaws that caused us to overrule Moore. See 85 Va. at 5-8, 6 S.E. at 701-03 (Lewis, C.J., dissenting).

Ewell involved a collateral attack upon a circuit court judgment which had been rendered in Lancaster County by a visiting judge for whom no order of designation had been entered as required by a statutory predecessor to Code § 17.1-105. The plurality in Ewell held the visiting judge entering the order "exceeded his jurisdiction in acting as a judge without the authority of the law, and the said judgment is without authority, and null and void." 85 Va. at 3, 6 S.E. at 701.

In an analysis mirroring the majority in Nelson and the dissent in Moore, the dissent in Ewell correctly stated:

> The judgment is collaterally assailed, and being a judgment rendered by a court of general jurisdiction, acting within the scope of its powers, and proceeding according to the course of the common law, and held at the time by one of the county judges of the state, it must, I think, be held to be valid. For no principle is better

established than that a judgment of such a court, when collaterally drawn in question, is not affected by errors or irregularities which do not show a want of jurisdiction, or an excess of jurisdiction.

. . . .

In short, my opinion is, that the provisions of the statute above referred to are directory merely, and that the county court having undisputed jurisdiction of the case in which the judgment was rendered, a failure to comply with the requirements of the statute could not affect the validity of the judgment in this collateral proceeding. The writ of prohibition cannot be permitted in a case like this to take the place of a writ of error or of an appeal, though they are in some cases concurrent remedies.

85 Va. at 5-7, 6 S.E. at 701-02 (Lewis, C.J., dissenting).

The plurality in Ewell was incorrect in construing the trial court's judgment as void, instead of voidable, and permitting a collateral attack by virtue of a defect in the exercise of the court's authority under its territorial jurisdiction for the same reason as the majority erred in Moore. The trial courts in Ewell and Moore had subject matter jurisdiction over the respective cases and the resulting judgments could not therefore be void and subject to collateral attack in a later proceeding based on a defect other than subject matter jurisdiction. Ewell and Moore erroneously elevated a defect in something other than subject matter jurisdiction to the same level of consequence. The failure of the appellant in Ewell to

38

timely object to the court's exercise of its jurisdiction should have ended that case and, as we noted in <u>Nelson</u>, the same should have occurred in <u>Moore</u> as well.  After <u>Nelson</u>, <u>Ewell</u> can have no validity and to the extent it conflicts with our opinion in <u>Nelson</u>, it is overruled.[13]

Whatever defects may have occurred with respect to the transfer of Porter's case to Arlington, and in returning to Norfolk, would only have affected the circuit court's exercise of its territorial jurisdiction and could only

_____

[13] In overruling <u>Ewell</u>, we note that case has only been cited six times by this Court since it was decided in 1888. <u>See</u> <u>Combs v. Commonwealth</u>, 90 Va. 88, 90, 17 S.E. 881, 881 (1893); <u>Prison Ass'n of Virginia v. Ashby</u>, 93 Va. 667, 671, 25 S.E. 893, 894 (1896) (citing <u>Ewell</u> for the proposition that "whatever jurisdiction this court exercises must be by virtue of some statute enacted in conformity to the Constitution"); <u>Price v. Smith</u>, 93 Va. 14, 15, 24 S.E. 474, 474 (1896) (stating that a court's jurisdiction "must be by virtue of statutory authority made in pursuance of the Constitution"); <u>Smith v. White</u>, 107 Va. 616, 619, 59 S.E. 480, 481 (1907); <u>Shelton v. Sydnor</u>, 126 Va. 625, 632, 102 S.E. 83, 86 (1920) (quoting from the dissenting opinion in <u>Ewell</u>); <u>Akers v. Commonwealth</u>, 155 Va. 1046, 1051, 156 S.E. 763, 765 (1930) (quoting from the dissenting opinion). Other than supporting the concept that a court's jurisdiction must derive from statutory authority made in pursuance of the Constitution, <u>Ewell</u> was otherwise distinguished or cited by reference to its dissenting opinion, which perhaps represents why we have never specifically relied upon it.  In that context, <u>Ewell</u> has no application for purposes of stare decisis.  Since the legal basis of <u>Ewell</u> is plainly wrong under <u>Nelson</u>, it is appropriate that <u>Ewell</u> be overruled. <u>See</u> <u>Harmon v. Sadjadi</u>, 273 Va. 184, 197, 639 S.E.2d 294, 301 (2007) ("[o]ur strong adherence to the doctrine of stare decisis does not . . . compel us to perpetuate what we believe to be an incorrect application of the law") (citation omitted).

39

have rendered the resulting judgments voidable if subject to a proper and timely objection.  Having failed to raise any objections, Porter has waived any such jurisdictional defects and the judgment of the circuit court is therefore unaffected.  Additionally, as we have already stated, we will not permit Porter to approbate and reprobate in the absence of a valid challenge to subject matter jurisdiction.

### C.   METHODS OF EXECUTION

In his initial assignment of error, Porter contends that the circuit court erred in denying his motion to declare the Commonwealth's lethal injection and electrocution methods for execution unconstitutional as being in violation of the prohibition against cruel and unusual punishment under the Eighth Amendment of the Constitution of the United States and Article I, Section 9 of the Constitution of Virginia.  Porter asserts that lethal injection, as it is administered in Virginia, is unconstitutional based upon the purportedly inadequate training of the staff administering the lethal injection, as well as the "deficiencies inherent in the lethal injection drugs themselves."  Porter further asserts that electrocution "violates contemporary standards of decency under the Eighth Amendment."  We reject Porter's arguments

40

because our clear precedent recognizes that electrocution is constitutionally permitted and the recent decision of the United States Supreme Court in Baze v. Rees, ___ U.S. ___, 128 S.Ct. 1520 (2008), does not undermine the constitutionality of lethal injection in Virginia.

This Court has previously held that execution by electrocution does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. Bell v. Commonwealth, 264 Va. 172, 202, 563 S.E.2d 695, 715 (2002), cert. denied, 537 U.S. 1123 (2003); Martin v. Commonwealth, 221 Va. 436, 439, 271 S.E.2d 123, 125 (1980). We find no reason to depart from our previous decisions.

Pursuant to Code § 53.1-234, a defendant convicted of capital murder in Virginia has the right to elect whether to be executed by electrocution or lethal injection. "When a condemned prisoner has a choice of method of execution, the inmate may not choose a method and then complain of its unconstitutionality, particularly when the constitutionality of the alternative method has been established." Orbe v. Johnson, 267 Va. 568, 570, 601 S.E.2d 543, 546, cert. denied, 541 U.S. 970 (2004). Our conclusion in Bell is similarly applicable in this case:

> Bell has the right to choose whether his
> execution will be by lethal injection or by
> electrocution. Because Bell has that choice and

41

> we have already ruled that execution by electrocution is permissible under the Eighth Amendment, it would be an unnecessary adjudication of a constitutional issue to decide whether lethal injection violates the Eighth Amendment. See Bissell v. Commonwealth, 199 Va. 397, 400, 100 S.E.2d 1, 3 (1957). We decline to do so, and likewise cannot say that the circuit court erred in denying Bell's motion for an evidentiary hearing to decide the constitutionality of lethal injection as a method of execution. Thus, we find no error in the court's denial of Bell's motion.

264 Va. at 203, 563 S.E.2d at 715-16.

Moreover, the Supreme Court in Baze rejected a challenge to Kentucky's lethal injection procedure similar to that raised by Porter. The Supreme Court held that a constitutional challenge fails unless "the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain. He must show that the risk is substantial when compared to the known and available alternatives. A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard." Baze, ___ U.S. at ___, 128 S.Ct. at 1537. Porter concedes that the Virginia protocol is "materially similar" to the Kentucky protocol.

Accordingly, we hold the circuit court did not err in denying Porter's motion regarding the methods of execution.

42

## D.    APPLICABILITY OF THE VIRGINIA ADMINISTRATIVE PROCESS ACT

In a related assignment of error, Porter asserts that the circuit court erred by denying his motion to suspend all executions until regulations providing the necessary procedures to carry out Virginia's death penalty statutes are properly promulgated.  Porter maintains that the particular procedures used for execution in Virginia are unlawful because the Department of Corrections has failed to comply with certain provisions of the Virginia Administrative Process Act ("APA"), Code §§ 2.2-4000 et seq.  Porter's assertions are without merit.

Agency action by the Virginia Department of Corrections concerning inmates of prisons does not fall within the scope of the APA.  Though the APA exempts certain Virginia agencies from its mandates specifically by name, it also creates exemptions for agency action by subject matter as well.  Accordingly, the Act exempts actions of agencies relating to "[i]nmates of prisons or other such facilities or parolees therefrom."  Code § 2.2-4002(B)(9).  In this context, the Virginia Department of Corrections is an agency whose sole purpose is related to inmates of prisons.  It is thus exempt from the strictures of the APA.  We therefore hold that the circuit court did

43

not err in rejecting Porter's motion to invalidate the execution procedures under the APA.

### E. ADMISSION OF EVIDENCE REGARDING PORTER'S STATUS AS A FELON

In his third assignment of error, Porter contends that the circuit court erred by admitting prejudicial evidence of his prior felony conviction during the Commonwealth's case-in-chief. During trial, the Commonwealth asserted that Porter's status as a convicted felon was admissible as evidence of Porter's possible motive for killing Officer Reaves. The Commonwealth maintained that Porter knew that it was illegal for him to carry a gun and, thus, shot the officer in order to escape arrest for possession of a firearm.

The Commonwealth similarly asserted that Porter's prior conviction proved an element of the offense charged under Code § 18.2-31(6). This was so, the Commonwealth contended, because Porter shot Officer Reaves "for the purpose of interfering with the performance of his official duties" as a law enforcement officer: to stop Officer Reaves from arresting him for possessing a gun while a convicted felon.

The circuit court allowed the Commonwealth to introduce evidence that Porter had previously been

convicted of a violent felony.  The court reasoned that this evidence tended to prove Porter's motive for the killing as well as "an element of the offense; that is, the murder was to interfere with the performance of a law enforcement officer's duties."

"The responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the trial court.  The exercise of that discretion will not be disturbed on appeal in the absence of a clear abuse."  Spencer v. Commonwealth, 240 Va. 78, 90, 393 S.E.2d 609, 617 (1990).

In Guill v. Commonwealth, 255 Va. 134, 138, 495 S.E.2d 489, 491 (1998), this Court held that, "[e]vidence of 'other crimes' is relevant and admissible if it tends to prove any element of the offense charged.  Thus, evidence of other crimes is allowed when it tends to prove motive, intent, or knowledge of the defendant."  (Internal citation omitted).  In the case at bar, Porter admitted that he knew when he shot Officer Reaves that, as a previously convicted felon, he was subject to a five-year mandatory prison sentence if found in possession of a firearm.  Such evidence is highly probative both of Porter's possible motivation for shooting Officer Reaves and to prove an essential element of the offense charged.

45

Furthermore, in a deliberate effort to lessen any inherent prejudice to Porter, the Commonwealth did not enter Porter's certified record of conviction or felony sentencing order for armed robbery, nor did the Commonwealth specifically detail the extent of Porter's other past bad acts. Rather, the jury was only informed that Porter was a "violent felon" as defined by Code § 18.2-308.2, that he was consequently prohibited by law from possessing a firearm, and that he would face a mandatory five-year prison sentence if found with a firearm in his possession. In this context, the probative value of this evidence outweighed any incidental prejudice to Porter. See Scates v. Commonwealth, 262 Va. 757, 761, 553 S.E.2d 756, 759 (2001). Accordingly, we hold that the circuit court did not abuse its discretion by allowing this evidence for the limited purpose of proving motive and an essential element of the crime of which Porter was charged under Code § 18.2-31(6). Bell v. Commonwealth, 264 Va. at 198-99, 563 S.E.2d at 713.

F. SECOND-DEGREE MURDER INSTRUCTION

Porter also assigns as error the circuit court's refusal to instruct the jury on the lesser-included offense of second-degree murder. Porter asserts that the evidence "that he shot Officer Reaves three times in rapid-fire

46

succession in an impulsive, unplanned and spontaneous surge of panic after the officer unexpectedly grabbed [his] arm, pointed his service revolver at him, and appeared to be about to kill him" was "squarely presented through his own testimony and supported by several witnesses." Porter contends the second-degree murder instruction was appropriate because "[h]e insisted throughout his testimony that he did not intend to kill Officer Reaves," and "the jury could fairly have entertained a reasonable doubt as to . . . whether his malicious killing of Officer Reaves was preceded by premeditation and deliberation."

The Commonwealth responds that Porter failed to offer more than a "scintilla of evidence" to support the second-degree murder instruction. Further, the Commonwealth insists that the circuit court did not err in refusing the instruction because "Porter admitted taking aim at Officer Reaves'[] head, standing within an arm's length, intending to shoot him and to putting a bullet into his head. After Officer Reaves fell onto the ground, Porter leaned over the officer and deliberately fired twice more."

The principles governing our review of a circuit court's refusal of a lesser included offense instruction regarding murder are well-settled.

We have long recognized that evidence showing a murder "to have been deliberate, premeditated and wilful could be so clear and uncontroverted that a trial court could properly refuse to instruct on the lesser included offenses." Painter [v. Commonwealth, 210 Va. 360, 366, 171 S.E.2d 166, 171 (1969)]. It follows, therefore, that a criminal defendant "is not entitled to a lesser degree instruction solely because the case is one of murder." Clark v. Commonwealth, 220 Va. 201, 209, 257 S.E.2d 784, 789 (1979), cert. denied, 444 U.S. 1049 (1980).

A second[-]degree murder instruction is only appropriate where it is supported by evidence. Justus v. Commonwealth, 222 Va. 667, 678, 283 S.E.2d 905, 911 (1981), cert. denied, 445 U.S. 983 (1982); Painter, 210 Va. at 367, 171 S.E.2d at 171. Moreover, the evidence asserted in support of such an instruction "must amount to more than a scintilla." Justus, 222 Va. at 678, 283 S.E.2d at 911; Hatcher v. Commonwealth, 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978).

Buchanan v. Commonwealth, 238 Va. 389, 409, 384 S.E.2d 757, 769 (1989).

"Because the issue on appeal deals with the circuit court's refusal of the lesser-included offense instruction . . . , and even though the Commonwealth prevailed at trial, we must view the evidence on this issue in the light most favorable to the defendant, the proponent of the instruction." Commonwealth v. Leal, 265 Va. 142, 145, 574 S.E.2d 285, 287 (2003). Applying the appropriate standard of review and viewing the evidence in the light most favorable to Porter, we hold that the circuit court did not

48

err in refusing to offer the second-degree murder instruction.

Porter failed to offer evidence "in support of a particular instruction [that] 'must amount to more than a scintilla.' " Schlimmer v. Poverty Hunt Club, 268 Va. 74, 78, 597 S.E.2d 43, 45 (2004) (quoting Justus v. Commonwealth, 222 Va. 667, 678, 283 S.E.2d 905, 911 (1981)). Further, we hold the evidence in this case of Porter's "deliberate, premeditated and wilful" murder of Officer Reaves was " 'so clear and uncontroverted that a trial court could properly refuse to instruct on the lesser included offenses.' " Buchanan, 238 Va. at 409, 384 S.E.2d at 769 (citation omitted).

Porter's only evidence that he murdered Officer Reaves without premeditation is his own testimony that he acted because he "was scared" that Officer Reaves "was going to kill [him]." Porter contends that testimony along with other evidence the shots were fired "rapidly" and that it would have been hard for him to remove Officer Reaves' pistol from its holster, are more than a scintilla of evidence negating premeditation. We disagree.

Other than Porter's claim that Officer Reaves pulled his gun first, there is no record evidence supporting that theory and thereby a second-degree murder instruction for

49

lack of premeditation.  Conversely, substantial and uncontroverted evidence demonstrated that, after Porter shot Officer Reaves the first time and Officer Reaves fell to the ground, Porter shot Officer Reaves twice more.  This description of the shooting does not correspond with Porter's contention that he "was scared" but further establishes his deliberation and premeditation, which is "an intent to kill that needs to exist only for a moment." Coles v. Commonwealth, 270 Va. 585, 590, 621 S.E.2d 109, 112 (2005) (quoting Green v. Commonwealth, 266 Va. 81, 104, 580 S.E.2d 834, 847 (2003)).

Moreover, Porter's own testimony proves his act of shooting Officer Reaves was one of premeditation and deliberation as this exchange during cross-examination reflects:

> Q.   You meant to hit Stanley Reaves with a bullet, didn't you?
>
> A.   Yes, sir.
>
> Q.   All right.  And you took aim – therefore, you took aim at him, correct?
>
> A.   Yes, sir.
>
> Q.   You took aim at a part of his body, correct?
>
> A.   Yes, sir.
>
> Q.   And the part of his body that you took aim at and then before pulling the trigger from less

than six inches away was directly into his forehead, correct?

A.   Yes, sir.

                    . . . .

Q.   And you agree that you knew you were aiming at his head, correct?

A.   Yes, sir.

Thus, "[t]he evidence to which [Porter] points falls far short of proving provocation, anger, passion, or any other fact that might serve to convince a jury that [Porter] acted without premeditation."  Buchanan, 238 Va. at 412, 384 S.E.2d at 771.

Not only does Porter's recited evidence fail to "amount to more than a scintilla" in support of a second-degree murder instruction, but this is a case where the evidence of premeditation is " 'so clear and uncontroverted that a trial court could properly refuse to instruct on the lesser included offenses.' "  Buchanan, 238 Va. at 409, 384 S.E.2d at 769 (citation omitted).  Accordingly, we hold that the circuit court did not err in refusing Porter's request for a second-degree murder instruction.

### G.   PRISON RISK ASSESSMENT EXPERT

After the circuit court had appointed a mental health expert and a neuropsychological expert to assist in Porter's defense, Porter filed the Prison Expert Motion

51

requesting that Dr. Mark D. Cunningham be appointed "as an expert on the assessment of the risk of violence by prison inmates and, in particular, the risk of future dangerousness posed by the defendant if incarcerated in a Virginia penitentiary for life." The circuit court denied the motion and Porter assigns error to that ruling because it did not allow him "to rebut the Commonwealth's allegation that the defendant constitutes a continuing threat to society, and also to establish, as a mitigating factor, that the likelihood of further serious violence by the defendant was low."

Our decision in Husske v. Commonwealth, 252 Va. 203, 476 S.E.2d 920 (1996), established the basis upon which a circuit court reviews the request of an indigent defendant for the appointment of an expert witness to assist in his defense. We described and applied the Husske analysis in Commonwealth v. Sanchez, 268 Va. 161, 597 S.E.2d 197 (2004) which guides our review in the case at bar.

> In Husske v. Commonwealth, 252 Va. 203, 476 S.E.2d 920 (1996), this Court noted that an indigent defendant is not constitutionally entitled, at the state's expense, to all the experts that a non-indigent defendant might afford. Id. at 211, 476 S.E.2d at 925. All that is required is that an indigent defendant have " 'an adequate opportunity to present [his] claims fairly within the adversary system.' " Id. (quoting Ross v. Moffitt, 417 U.S. 600, 612 (1974)).

52

In *Husske* we held that

> an indigent defendant who seeks the
> appointment of an expert witness, at
> the Commonwealth's expense, must
> demonstrate that the subject which
> necessitates the assistance of the
> expert is "likely to be a significant
> factor in his defense," and that he
> will be prejudiced by the lack of
> expert assistance.

*Id*. at 211-12, 476 S.E.2d at 925 (citation
omitted). In that context, we specified that a
defendant seeking the assistance of an expert
witness "must show a particularized need" for
that assistance. *Id*.

It is the defendant's burden to demonstrate
this "particularized need" by establishing that
an expert's services would materially assist him
in preparing his defense and that the lack of
such assistance would result in a fundamentally
unfair trial. *Id*.; *accord* Green v. Commonwealth,
266 Va. 81, 92, 580 S.E.2d 834, 840 (2003). We
made clear in *Husske* and subsequent cases that
"mere hope or suspicion that favorable evidence
is available is not enough to require that such
help be provided." 252 Va. at 212, 476 S.E.2d at
925 (internal quotation marks omitted). Whether
a defendant has made the required showing of
particularized need is a determination that lies
within the sound discretion of the trial court.

268 Va. at 165, 597 S.E.2d at 199.

Porter attached several documents to the Prison Expert

Motion including his curriculum vitae and a "Declaration"

which had been filed in a separate capital murder case,

Gray v. Commonwealth, 274 Va. 290, 645 S.E.2d 448 (2007),

cert. denied, ___ U.S. ___, 128 S.Ct. 1111 (2008) (the

53

"Gray Declaration").  However, at no place in the Prison Expert Motion does Porter represent that Dr. Cunningham's evidence as to him would be of the same nature as in the Gray Declaration.

Porter acknowledges that he "must show a particularized need" under Husske.  In his Prison Expert Motion, however, Porter primarily focused on criticizing prior decisions of this Court regarding prison risk assessment experts and lauding the virtues of various statistical modes of analysis to project rates of prison inmate violence.  Porter cited a number of studies about statistical analysis of the rates of prison inmate violence at various times and settings and upon which Dr. Cunningham's evidence would be based.  Porter represented that "context and statistical and actuarial data . . . are indispensable to the determination of risk."  Porter argued that the statistical evidence of conditions during life imprisonment in the penitentiary "must be admissible to rebut the Commonwealth's assertion that the defendant will probably commit criminal acts of violence in the future." Porter also contended that in examining the aggravating factor of future dangerousness under Code § 19.2-264.4(C) "the only 'society' to which the defendant can ever pose a 'continuing serious threat' is prison society."  "[T]he

future dangerousness inquiry is concerned only with that violence that is both 'criminal' and 'serious' and occurs behind prison walls during the natural life of the capital life inmate."

Porter indicated in the Prison Expert Motion that our prior decisions in Burns v. Commonwealth, 261 Va. 307, 541 S.E.2d 872, cert. denied, 534 U.S. 1043 (2001), and Lovitt v. Commonwealth, 260 Va. 497, 537 S.E.2d 866 (2000), cert. denied, 534 U.S. 815 (2001), were in error. Among other reasons, Porter contended that we incorrectly interpreted the term "society" as used in Code § 19.2-264.2 and 19.2-264.4(C). Porter argued "it is manifestly impossible for a defendant adequately to explain why he is not a continuing serious threat to society without introducing evidence of the conditions of prison incarceration, including prison security and the actual rates of serious criminal violence in prison."

The Commonwealth responded to Porter's Expert Motion by citing our prior decisions in Burns, Cherrix v. Commonwealth, 257 Va. 292, 513 S.E.2d 642, cert. denied, 528 U.S. 873 (1999), Juniper, and Walker v. Commonwealth, 258 Va. 54, 515 S.E.2d 565 (1999), cert. denied, 528 U.S. 1125 (2000). The Commonwealth noted, consonant with that precedent, that "what a person may expect in the penal

system is not relevant mitigation evidence," and that Porter's proffer failed to tender evidence that "concern[s] the history or experience of the defendant" (citing Cherrix, 257 Va. at 310, 513 S.E.2d at 653).

After hearing oral argument, the circuit court denied the motion and opined from the bench that Dr. Cunningham's proffered evidence "does not concern the history or experience of the defendant. . . . I have to venture to conclude an expert in his field could take any general claims he might make with respect to the prison framework and apply it to an individual. That doesn't make it particular." Further, the circuit court explained that because the Commonwealth was "simply going to be going into the defendant's personal history and acts" and offering nothing as to prison life, Dr. Cunningham was not a proper rebuttal witness.

On appeal, Porter contends that, in the circuit court, he made it "clear that Dr. Cunningham would provide an individualized assessment of the risk posed by Porter." Porter argues he could not rebut the Commonwealth's evidence of future dangerousness based on his prior criminal record and the facts of the crime without Dr. Cunningham's testimony. He contends that Dr. Cunningham's proffered evidence should have been admissible under

Simmons v. South Carolina, 512 U.S. 154 (1994) and the failure to afford him that expert "prejudiced" Porter in two ways:

> First, it rendered unreliable the jury's finding in favor of the Commonwealth on the future threat predicate – a finding that provided the sole aggravating factor supporting the death penalty. And second, even if Dr. Cunningham's rebuttal testimony had not altogether prevented a dangerousness finding by the sentencing jury, it would at least have substantially reduced the weight that the jury would have accorded to the existence of that factor when making its ultimate sentencing decision.

Porter thus concludes he met the required Husske showing of a "particularized need" and the circuit court's failure to appoint Dr. Cunningham as his expert requires that the court's judgment be reversed.

To resolve the issue before us, we begin with a review of the pertinent statutes, Code § 19.2-264.2 and Code § 19.2-264.4(C), and our decisions in which we considered prison-setting evidence a defendant sought to offer at a capital murder sentencing. We will then review Porter's actual proffer in this case and apply that precedent in evaluating whether the circuit court abused its discretion in denying the Prison Expert Motion.

Code § 19.2-264.2 provides in pertinent part as follows:

57

> In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the <u>past criminal record of convictions of the defendant</u>, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society.

(Emphasis added.)  Code § 19.2-264.4(C) similarly provides that the penalty of death shall not be imposed unless the Commonwealth proves

> beyond a reasonable doubt that there is a probability based upon evidence of the <u>prior history of the defendant or of the circumstances surrounding the commission of the offense</u> of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society.

(Emphasis added.)

The plain directive of these statutes is that the determination of future dangerousness is focused on the defendant's "past criminal record," "prior history" and "the circumstances surrounding the commission of the offense."  These standards defining the future dangerousness aggravating factor are the basis of our earlier decisions which considered motions for appointment of prison risk experts or the proffer of prison risk evidence.

In <u>Cherrix</u>, the defendant "sought to introduce" evidence which "involved the general nature of prison life"

58

as mitigating evidence of his future dangerousness.  257

Va. at 309, 513 S.E.2d at 653.  We noted that

> [a]lthough the United States Constitution
> guarantees the defendant in a capital case a
> right to present mitigating evidence to the
> sentencing authority, it does not limit "the
> traditional authority of a court to exclude, as
> irrelevant, evidence not bearing on the
> defendant's character, prior record, or the
> circumstances of his offense."

Id. (quoting Lockett v. Ohio, 438 U.S. 586, 605 n.12

(1978)).  We held that the circuit court properly excluded

Cherrix' prison setting evidence because "none of this

evidence concerns the history or experience of the

defendant.  We agree with the conclusion of the trial court

that what a person may expect in the penal system is not

relevant mitigation evidence."  Id. at 310, 513 S.E.2d at

653.  We also noted that "none of the evidence proffered at

trial addressed Cherrix's ability to conform or his

experience in conforming to prison life."  Id. at 310 n.4,

513 S.E.2d at 653 n.4 (internal quotation marks omitted).

We next addressed the issue in Lovitt, when the

defendant argued that under Code § 19.2-264.2 "the only

society that should be considered in this case for purposes

of 'future dangerousness' is prison society."  260 Va. at

516, 537 S.E.2d at 878.  We rejected this argument because

"[t]he statute does not limit this consideration to 'prison

59

society' when a defendant is ineligible for parole, and we decline Lovitt's effective request that we rewrite the statute to restrict its scope." Id. at 517, 537 S.E.2d at 879.

In Burns, the defendant "attempted to introduce evidence concerning the conditions [in prison] in rebuttal to the Commonwealth's evidence of Burns' future dangerousness." 261 Va. at 338, 541 S.E.2d at 892. Burns acknowledged that we had rejected a similar claim in Cherrix as improper mitigating evidence, but he proffered his evidence "in rebuttal to the Commonwealth's evidence of Burns' future dangerousness." Id. The Commonwealth's evidence "concerning Burns' future dangerousness consisted of his prior criminal record and unadjudicated criminal acts." Id. at 339, 541 S.E.2d at 893. Burns contended he should be allowed to rebut that evidence with witnesses echoing the rejected evidence in Lovitt, and similar to Porter's proffer, "that his opportunities to commit criminal acts of violence in the future would be severely limited in a maximum security prison." Id. We held the circuit court did not err in rejecting the proffered evidence because "Burns' evidence was not in rebuttal to any evidence concerning prison life" from the Commonwealth. Id.

We explained that our decision concerning the risks and consequences of prison life rested on the specific language of the controlling statutes, §§ 19.2-264.2 and 19.2-264.4(C):

> [T]he relevant inquiry is not whether Burns <u>could</u> commit criminal acts of violence in the future but whether he <u>would</u>. Indeed, Code §§ 19.2-264.2 and -264.4(C) use the phrase "would commit criminal acts of violence." Accordingly, the focus must be on the particular facts of Burns' history and background, and the circumstances of his offense. In other words, a determination of future dangerousness revolves around an individual defendant and a specific crime. Evidence regarding the general nature of prison life in a maximum security facility is not relevant to that inquiry, even when offered in rebuttal to evidence of future dangerousness.

261 Va. at 339-40, 541 S.E.2d at 893. We also analyzed Burns' claims based on his argument that the decisions of the United States Supreme Court in <u>Simmons</u> and <u>Skipper v. South Carolina</u>, 476 U.S. 1 (1986), entitled him to present this evidence to the fact-finder. We found neither case applicable because the evidence of future prison conduct was not particularized and individualized to the defendant and guided by the statutory requirements of his criminal history and background. "Unlike the evidence proffered by Burns, the evidence in <u>Skipper</u> was peculiar to that defendant's history and background." <u>Id</u>. at 340, 541 S.E.2d at 894.

61

We again addressed this general issue in <u>Bell</u>, when the defendant requested the appointment of an expert

> to assess his likelihood of being a future danger in prison, and to testify concerning the correctional systems used in a maximum security prison to manage inmates and prevent acts of violence.
>
> . . . .
>
> Bell asserts that evidence concerning the prison conditions in which he would serve a life sentence is relevant not only in mitigation and in rebuttal to the Commonwealth's evidence of future dangerousness, but also to his "future adaptability" to prison life.

264 Va. at 199-200, 563 S.E.2d at 713. Echoing Porter's claims in the case at bar, Bell contended that our decisions in <u>Cherrix</u> and <u>Burns</u> were erroneous and cited the United States Supreme Court decisions in <u>Simmons</u>, <u>Skipper</u> and <u>Williams v. Taylor</u>, 529 U.S. 362 (2000) to support his argument. <u>Bell</u>, 264 Va. at 199, 563 S.E.2d at 713.

As in <u>Burns</u>, we noted that the evidence in <u>Skipper</u> and <u>Williams</u> was individualized specifically to those defendants' prior acts while incarcerated and were not statistical projections of future behavior. We then noted that in <u>Cherrix</u> and <u>Burns</u>,

> the "common thread" in these cases is that evidence peculiar to a defendant's character, history and background is relevant to the future dangerousness inquiry and should not be excluded from a jury's consideration. This includes evidence relating to a defendant's current

62

> adjustment to the conditions of
> confinement. . . . But, as we had already stated,
> "[e]vidence regarding the general nature of
> prison life in a maximum security facility is not
> relevant to that inquiry, even when offered in
> rebuttal to evidence of future dangerousness."

Id. at 201, 563 S.E.2d at 714 (citing Burns, 261 Va. at 340, 541 S.E.2d at 893).  We then held that the circuit court had not abused its discretion in denying the appointment of Bell's prison risk expert because he had not met the requirements of Husske.

> While we do not dispute that Bell's "future
> adaptability" in terms of his disposition to
> adjust to prison life is relevant to the future
> dangerousness inquiry, Bell acknowledged on brief
> that the individual that he sought to have
> appointed has been qualified previously as an
> expert in prison operations and classification.
> The testimony that Bell sought to introduce
> through the expert concerned the conditions of
> prison life and the kind of security features
> utilized in a maximum security facility.  That is
> the same kind of evidence that we have previously
> rejected as not relevant to the future
> dangerousness inquiry. See Burns, 261 Va. at 340,
> 541 S.E.2d at 893; Cherrix, 257 Va. at 310, 513
> S.E.2d at 653.  Nor is such general evidence, not
> specific to Bell, relevant to his "future
> adaptability" or as a foundation for an expert
> opinion on that issue. Thus, we conclude that the
> circuit court did not err in denying Bell's
> motion.  Bell failed to show a "particularized
> need" for this expert.  Lenz v. Commonwealth, 261
> Va. 451, 462, 544 S.E.2d 299, 305, cert. denied,
> 534 U.S. 1003 (2001). In light of the
> inadmissibility of the evidence that Bell sought
> to introduce through the expert, he also failed
> to establish how he would be prejudiced by the
> lack of the expert's assistance. See id.

264 Va. at 201, 563 S.E.2d at 714-15.

63

Lastly, we addressed this issue in Juniper, when the indigent defendant sought the appointment of a psychologist to make a "risk assessment for future dangerousness" showing that such risk "was different in a prison setting from that in an open community." 271 Va. at 424, 626 S.E.2d at 422. For the reasons previously stated in Cherrix, Burns and Bell, we determined that the circuit court properly exercised its discretion in denying appointment of the proposed expert because "what a person may expect in the penal system is not relevant mitigation evidence." Id. at 425, 626 S.E.2d at 423 (quoting Cherrix, 257 Va. 310, 513 S.E.2d at 653).

Citing Burns, we re-emphasized that "the focus must be on the particular facts of [the defendant's] history and background, and the circumstances of his offense. In other words, a determination of future dangerousness revolves around an individual defendant and a specific crime." Id. at 426, 626 S.E.2d at 423 (quoting Burns, 261 Va. at 339-40, 541 S.E.2d 893-94). We went on to state that

> evidence relating to a prison environment must connect the specific characteristics of the particular defendant to his future adaptability in that environment in order to be heard by the jury. It must be "evidence peculiar to a defendant's character, history and background" in order to be "relevant to the future dangerousness inquiry . . . ."

Id. at 426, 626 S.E.2d at 424 (quoting Bell, 264 Va. at

201, 563 S.E.2d at 714). We concluded that the proffer of

testimony in Juniper did not meet these tests because none

of it tied the

> proposed opinion testimony on future
> dangerousness in a prison environment to
> Juniper's "history and background, and the
> circumstances of his offense," Burns, 261 Va. at
> 340, 541 S.E.2d at 893, to Juniper's "character,
> history and background" or was "specific to
> [Juniper], relevant to his 'future
> adaptability.' " Bell, 264 Va. at 201, 563
> S.E.2d at 714.

Id. at 427, 626 S.E.2d at 424.

With the statutory future dangerousness requirements

and our precedent firmly in mind, we now turn to the actual

proffer of Dr. Cunningham's proposed evidence so as to

measure that proffer against those factors. Porter's

Prison Expert Motion for appointment of Dr. Cunningham is

notable for an essential, but missing, element. At no

place in the motion does he proffer that Dr. Cunningham's

statistical analysis of a projected prison environment will

"focus . . . on the particular facts of [his] history and

background, and the circumstances of his offense." Burns,

261 Va. at 340, 541 S.E.2d at 893; see Code §§ 19.2-264.2

and Code § 19.2-264.4(C). Nothing in Porter's motion is a

proffer of an "individualized" or "particularized" analysis

of Porter's "prior criminal record," "prior history", his

65

prior or current incarceration, or the circumstances of the crime for which he had been convicted.  See id., Juniper, 271 Va. at 427, 626 S.E.2d at 424, Bell, 264 Va. at 201, 563 S.E.2d at 714, Burns, 261 Va. at 339-40, 541 S.E.2d at 893.

Porter's proffer in the motion was that Dr. Cunningham would testify as to a statistical projection of how prison restrictions could control an inmate (situated similarly to what he would project Porter to face) in a likely prison setting.  Nothing in this proffer relates to the essential statutory elements in Code §§ 19.2-264.2 and 19.2-264.4 that focus the future dangerousness inquiry on the defendant's prior history, prior criminal record and/or the circumstances of the offense.  Additionally, nothing in Porter's proffer analyzes our application of this statutory directive to the "defendant's character, history and background."  Not only is the Prison Expert Motion devoid of any reference that the proffered evidence would be "individualized" or "particularized" to Porter, his post conviction Motion for a New Trial was similarly silent.

Porter's proffered evidence is not substantially different from the type we rejected in Burns and Bell.  As in Burns, the Commonwealth in this case neither proposed nor introduced any evidence concerning Porter's prospective

66

life in prison, but limited its evidence on the future dangerousness aggravating factor to the statutory requirements represented by Porter's "prior criminal record and unadjudicated criminal acts.  Thus [Porter's] evidence was not in rebuttal to any evidence concerning prison life."  261 Va. at 339, 541 S.E.2d at 893.

Strikingly similar to Porter's argument in the case at bar was the defendant's argument in Bell, when the defendant also requested that an expert be appointed "to assess his likelihood of being a future danger in prison, and to testify concerning the correctional systems used in a maximum security prison to manage inmates and prevent acts of violence."  264 Va. at 199, 563 S.E.2d at 713. Porter's proposed statistical projection on future violent acts of an inmate who may be similarly situated to Porter is nearly identical to the rejected claim in Bell.  "The testimony that Bell sought to introduce through the expert concerned the conditions of prison life and the kind of security features utilized in a maximum security facility. That is the same kind of evidence that we have previously rejected as not relevant to the future dangerousness inquiry."  Id. at 201, 563 S.E.2d at 714.  We rejected Bell's argument and found the circuit court committed no abuse of discretion in denying his motion for appointment

of an expert because the proffered evidence was both (1) improper rebuttal evidence for the same reasons as in Burns, and (2) not relevant for mitigation because the proffered evidence, like Porter's evidence, was not "peculiar to a defendant's character, history and background."  Id.  Thus, "Bell failed to show a 'particularized need' for this expert."  Id at 201, 563 S.E.2d at 715.  So has Porter.

Our analysis in Bell also informs as to why Porter's reliance on the Supreme Court decisions in Skipper, Simmons and Williams is as unavailing here as it was in that case. In Skipper and Williams, individualized and particularized testimony about the defendant's past behavior during incarceration was available but not presented because in one case it was barred by the trial court, see Skipper, 476 U.S. at 3-4, and in the other case defense counsel failed to offer the individualized material that was available. Williams, 529 U.S. at 368-71, 396.  This was error because each defendant was entitled to show these historical events which were particularized and individualized to that defendant.  Id.  Porter's evidence is simply not of the same character as that in Skipper and Williams because it is not individualized or particularized to Porter's past

criminal acts or incarceration as required by the statutory factors on future dangerousness.[14]

We also note that our use of the term "future adaptability" in Bell and Juniper must be read in proper context. That context is the statutory mandate for the findings in Code §§ 19.2-264.2 and 19.2-264.4(C) which is the guiding framework of our prior decisions relating to future dangerousness. As noted earlier, the future dangerousness finding is to be based on evidence of the "prior history of the defendant or of the circumstances surrounding the commission of the offense." Code § 19.2-264.4(C). Thus when we used the term "future adaptability", we meant that term only as future dangerousness can be derived from the context of the defendant's past acts, both as to his "criminal record" and "prior history" and including his past incarceration and the circumstances of the capital crime. See Bell, 264 Va. at 199, 563 S.E.2d at 713.

Porter's defective proffer is not saved by his claim on appeal that the Gray Declaration showed an individualized or particularized proffer as to Porter. At

---

[14] Similarly, Bell's and Porter's reliance on Simmons was misplaced because that case dealt solely with information regarding parole eligibility, an issue not

69

no place in the Prison Expert Motion, or in his oral argument before the circuit court, does Porter state that Dr. Cunningham intends to do in his case that which he purported to do in the Gray case.  Even if we assume that the representation in the Gray Declaration would meet the test of our prior decisions, Porter never proffered that analysis was what he intended in this case.[15]

Porter contends that he made a sufficiently individualized proffer when arguing the Prison Expert Motion before the circuit court.  It is true that Porter used some key terms like "individualized testimony" but his entire argument on that point consisted of the following:

---

before the Court in this case.  See Simmons, 512 U.S. at 156.

[15] Even if we assumed Porter intended his proffer in the Prison Expert Motion to be that Dr. Cunningham would do for Porter what the Gray Declaration indicates for Mr. Gray, the tenor of the Gray Declaration raises the same issues already discussed with regard to our precedent in Burns and Bell.  Even though Dr. Cunningham has adopted the use of key words like "individualized assessment," the analysis appears to be of the same genre of the rejected proffers of how security measures in a future incarceration may affect a defendant's ability to commit more violent acts.  For example, he states in the Gray Declaration that "[b]ecause risk is always a function of context or preventative interventions, increased security measures can act to significantly reduce the likelihood of Mr. Gray engaging in serious violence in prison.  Mr. Gray's risk of violence in the face of such increased security measures can also be projected."  Our precedent is clear that such evidence is not relevant either in rebuttal or mitigation as to the future dangerousness factor.

70

> This is individualized testimony with regard to Thomas Porter's future risk in a penitentiary setting.
>
> Dr. Cunningham, as stated in his affidavit . . . will be able to opine in a scientific matter based on an individualized assessment of Mr. Porter, which includes prior behavior while he was incarcerated in the past, to include the 76 unadjudicated bad acts that the Commonwealth has noticed; appraisals of past security requirements while he was incarcerated; and his age; his level of education and comparative review of the statistical data regarding similarly-situated inmates.

The representation on oral argument is simply too vague to have any meaning.

Porter's proffer in the Prison Expert Motion fails to address the statutory factors under Code § 19.2-264.2 and 19.2-264.4(C) as being individualized and particularized as to Porter's prior history, conviction record and the circumstances of the crime. As our precedent would render inadmissible the statistical speculation he does offer, Porter has failed to show the "particularized need" necessary to meet the Husske test. "In light of the inadmissibility of the evidence that [Porter] sought to introduce through the expert, he also failed to establish how he would be prejudiced by the lack of the expert's assistance." Bell, 264 Va. at 201, 563 S.E.2d at 715. Accordingly, we conclude that the circuit court did not abuse its discretion in denying the Prison Expert Motion.

71

H.    COMMENTS DURING CLOSING ARGUMENT ABOUT "SOCIETY"

In a separate assignment of error partially related to his arguments on the Prison Expert Motion, Porter contends that the circuit court erred during the penalty phase of the trial when it made "prejudicial" comments and "intemperate" curative instructions.  Specifically, Porter argues the circuit court "erred by making prejudicial comments concerning the definition of 'society' during defense counsel's closing argument; by stating prejudicial, intemperate, and one-sided 'curative' mid-argument instructions on this point; and by denying the defendant's motion for a mistrial following this incident."

The record shows that the circuit court interrupted Porter's counsel during closing argument in order to instruct the jury that society meant "[e]verybody, anywhere, anyplace, anytime" in response to comments from counsel that "society" meant prison society.  When Porter's counsel again made similar remarks, a discussion at the bench occurred which led the court to comment to the jury that "society" was a "definitional word" that was not "complex" and "pretty simple" to understand.  At no point during either interruption did Porter's counsel object to the court's comments.  At the conclusion of his closing arguments, Porter's counsel moved for a mistrial based on

72

the court's comments, which motion the court denied.  The next day, Porter filed a written mistrial motion, which the court also denied.

Porter contends that the court's comments violated his Sixth Amendment right to have counsel present a summation of the evidence to the jury and denied him a fair opportunity to rebut the Commonwealth's allegation that he would be a continuing threat to society.  Porter maintains that the court's comments prejudiced him as the jury could have interpreted the comments as a form of rebuttal from the court in which the court appeared to agree with the Commonwealth's contention that Porter was a continuing threat to society.

We do not consider the merits of Porter's contentions because the record shows that he failed to timely object to any of the circuit court's comments.  Rule 5:25.  See also Reid v. Baumgardner, 217 Va. 769, 774, 232 S.E.2d 778, 781 (1977) (citing Russo v. Commonwealth, 207 Va. 251, 256-57, 148 S.E.2d 820, 824-25 (1966)) (finding that an objection must be made at the time words are spoken and the objection is waived if not timely made).

## I.  COURTROOM SECURITY

Porter also assigns as error the circuit court's ruling "denying the defendant's motion for relief from

excessive, unjustified and prejudicial in-court security, which included the presence of two uniformed officers continuously standing over the seated defendant during the proceedings."  Relevant to this assignment of error, the parties stipulated for the record that the bench was 21 feet in front of counsel table and the bar of the court was 12 feet behind that table.  Six deputies provided courtroom security throughout Porter's trial.  One deputy stood by the bench near the clerk, another stood near the witness stand, a third deputy stood at the witnesses' entrance, a fourth deputy stood at the entrance to the spectator's gallery, and two others stood directly behind Porter between counsel table and the bar.  On the fifth day of his trial, Porter objected to the two deputies standing behind him instead of being seated.

Porter argued that these deputies should be seated just within the bar of the court in accordance with a security arrangement Porter alleged he made with the sheriff's office prior to trial.  Porter maintained that standing so close to him was unnecessary because he wore a 50,000 volt stun belt for security purposes, and that the standing deputies prejudiced the jury by implying that Porter was "incredibly dangerous."  The circuit court responded that:

[O]ne, you have given me no Virginia statutory provisions that says [sic] that I have the authority to direct the sheriff's department as to how to conduct their security functions that they are required to conduct for the courts in Virginia.

Two, you haven't given me a single Virginia case that says that I have any authority in that regard.

. . . .

I don't believe I have the authority to tell the sheriff's department how to conduct security in the courtrooms.

. . . .

I don't believe you have given me enough information to make me believe that what they are doing is causing any undue prejudice in the course of this trial. So I'm not going to accept your invitation to go outside my authority to tell them how to do their job.

The court also noted that:

[I]n fact, we are on the fifth day of the trial. The procedures that you complain of, from my observations, have been in place the entire trial, every day of the trial.

I haven't noticed any difference in the way the bailiffs have operated or conducted themselves for the full five days of this trial. This is the first time that you have raised this issue with the [c]ourt.

The following day, Porter's counsel filed and argued a written motion for relief from "excessive and prejudicial in-court security presence." Porter argued the "police display not only destroys the presumption of innocence to

75

which every defendant is entitled, but also impermissibly telegraphs law enforcement's answer to the sentence-related determination of whether the defendant poses a continuing threat of future violence." Porter supplied the court with supplemental authority reflecting that the control of courtroom security was within the circuit court's discretion and renewed his request that the deputies be seated in chairs just inside the bar of the court instead of standing.

In response, the Commonwealth noted that on February 15, 2007, while in custody awaiting trial, Porter had refused to obey deputies' instructions to leave his holding cell to be brought into court. Consequently, the deputies had been obliged to adopt unusual measures on that occasion: "to actually handcuff him behind his back, to put a stun belt on, and had [him placed in] shackles in stocking feet." The Commonwealth stipulated that Porter had not misbehaved while in the courtroom but that the deputies "obviously . . . have to be aware of the defendant's history and . . . that's something they take into account when they decide what measures they need to take in regard to any particular defendant in a courtroom during trial. So . . . that is something that cannot be ignored."

76

The Commonwealth also observed that the deputies had simply been standing behind Porter and had not interfered with the proceedings or attempted to influence the jury:

> They are standing there still, quiet; they are not making any gestures towards Mr. Porter that would indicate their opinion of whether Mr. Porter presents a danger to the courtroom. They just appear to be stationed in a certain location within the courtroom as other deputies are stationed, and the place they are stationed has to do with what their duties are.
>
> . . . .
>
> So I think the security measures being taken are reasonable. I don't think they are such that the jury would think anything of them at all or think they reflect any message that is being sent to them regarding the defendant.

The circuit court declined to order the deputies to sit down and noted:

> One additional fact, though, from the February 15th hearing has to be put on the record that the [c]ourt security is aware of and that is although – actually, two additional facts.
>
> Although there was no in-court, during-court-proceedings outbursts, the day began with him refusing to leave his cell and they had to physically dress him. So he wasn't cooperative from that point on that day. And that day also included clear evidence by the sheriff's department that he did attempt to tamper with the stun belt that he was wearing at the time.
>
> So he has demonstrated on prior occasions where the sheriffs have, in their efforts to provide their constitutional mandate under the Code of Virginia to provide courtroom security, to present him in a way in which he does not appear in any forms of shackles, he has

77

demonstrated that he's not necessarily willing to
comply.

. . . .

And the problem with [them] sitting down is
the field of vision.  It does affect their field
of vision.

Later that day, Porter noted that, although the

deputies had moved back to stand between 6 and 7 feet

behind him during trial, they were moving to stand within 2

feet whenever Porter stood.  On this basis, Porter moved

for a mistrial, which the circuit court denied.

Porter testified in his own defense on the seventh day

of the trial.  Prior to testifying, however, Porter renewed

his motion for relief from the positioning of deputies in

the courtroom.  The Commonwealth responded that additional

deputies had similarly been present during the testimony of

another witness, Henry Chatman, who was in custody at the

time of his testimony.  The Commonwealth argued that

additional security measures were therefore not

particularized to Porter.  "It's [sic] looks like standard

courtroom security measures in any case.  I don't believe

it conveys any prejudicial message to the jury as [Porter]

suggested."

The circuit court agreed with the Commonwealth:

[S]ecurity exists to the extent that it
exists in this particular case not just because

it's a responsibility of the sheriff to do so, but because Mr. Porter has throughout his confinement and court appearances demonstrated reasons why they need to be concerned. And I have articulated those for the record previously and those things have not changed.

Other than that, though, I find that there is not a sense of overwhelming force; there are no guns drawn, they are casual, they are sitting. They are motionless. They are simply in a position to make sure that nothing happens.

I think that's reasonable. I don't think that in the context of the entire trial that this is the type of – this reaches the level of concerns that you have addressed with your case law that you have submitted to the [c]ourt. And therefore, though you note it, I'm not going to direct them to change.

After sentencing, Porter again alleged in a motion for a new trial that courtroom security had been excessive and prejudicial. He now assigns error to the adverse rulings of the circuit court, arguing that the courtroom security arrangement "negated [his] presumption of innocence" and, by implying that Porter was dangerous, prejudiced him at sentencing because the jury's decision "ultimately rested on the dangerousness predicate alone." On appeal, Porter contends that the decisions of the United States Supreme Court in <u>Deck v. Missouri</u>, 544 U.S. 622 (2005), <u>Holbrook v. Flynn</u>, 475 U.S. 560 (1986), and <u>Estelle v. Williams</u>, 425 U.S. 501 (1976) support his argument and require reversal of the circuit court's judgment. We disagree.

We review Porter's claim for abuse of discretion by the circuit court.  Frye v. Commonwealth, 231 Va. 370, 381, 345 S.E.2d 267, 276 (1986).  However, "[a circuit] court by definition abuses its discretion when it makes an error of law. . . .  The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions."  Koon v. United States, 518 U.S. 81, 100 (1996); see also Twine v. Commonwealth, 48 Va. App. 224, 231, 629 S.E.2d 714, 718 (2006); Auer v. Commonwealth, 46 Va. App. 637, 643, 621 S.E.2d 140, 143 (2005).

The circuit court misstated the law in response to Porter's initial motion on the fifth day of trial when he opined the control of courtroom security was outside the court's purview.  However, the court quickly corrected its misinterpretation the next day when Porter responded to the circuit court's invitation to supply legal authority.  "The trial judge has overall supervision of courtroom security." Payne v. Commonwealth, 233 Va. 460, 466, 357 S.E.2d 500, 504 (1987).  Because of our resolution on the merits, the circuit court's initial ruling and mistake in determining the proper discretion over courtroom security is of no consequence.

"[O]ne accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." Taylor v. Kentucky, 436 U.S. 478, 485 (1978). Accordingly, courts are required "to safeguard against 'the intrusion of factors into the trial process that tend to subvert its purpose'" by prejudicing the jury. Woods v. Dugger, 923 F.2d 1454, 1456 (11th Cir. 1991) (quoting Estes v. Texas, 381 U.S. 532, 560 (1962) (Warren, C.J., concurring)).

Naturally, "[t]he actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But . . . the probability of deleterious effects on fundamental rights calls for close judicial scrutiny." Estelle, 425 U.S. at 504. That close scrutiny consists of "look[ing] at the scene presented to jurors and determin[ing] whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." Holbrook, 475 U.S. at 572. In the case at bar, Porter has demonstrated no actual prejudice. Accordingly,

our review is limited to the question whether the courtroom security measures permitted by the circuit court over Porter's objection were inherently prejudicial.

The Supreme Court decisions in Estelle and Deck are fundamentally distinguishable from the circumstances of the case at bar. Estelle concerned a defendant being required to appear for trial in distinct prison garb. Deck dealt with a defendant compelled to appear at trial in visible shackles and other restraints. These circumstances are not present in Porter's case and we determine Estelle and Deck to be factually distinguishable. Holbrook is closer, factually, to the case at bar, but does not provide the support Porter envisions.

"Whenever a courtroom arrangement is challenged as inherently prejudicial . . . the question must be . . . whether 'an unacceptable risk is presented of impermissible factors coming into play.' " Holbrook, 475 U.S. at 570 (quoting Estelle, 425 U.S. at 505). The Supreme Court in Holbrook dealt with the prejudicial effect courtroom security officers may have on a jury. There, six defendants were tried jointly upon charges of robbery and four uniformed state troopers sat immediately behind them, albeit outside the bar of the court in the first row of the spectators' gallery. Holbrook, 475 U.S. at 562. The Court

held that, while "[w]e do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial . . . we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section." Holbrook, 475 U.S. at 570-71. "Even had the jurors been aware that the deployment of troopers was not common practice . . . we cannot believe that the use of the four troopers tended to brand respondent in their eyes 'with an unmistakable mark of guilt.' " Id. at 571. Moreover, the Court expressly declined to create "a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate." Id. at 569.

The Court clearly considered the practical reality that security presence in any courtroom is usually not inherently prejudicial:

> Jurors may just as easily believe that the
> officers are there to guard against disruptions
> emanating from outside the courtroom or to ensure
> that tense courtroom exchanges do not erupt into
> violence. Indeed, it is entirely possible that
> jurors will not infer anything at all from the
> presence of the guards. If they are placed at
> some distance from the accused, security officers
> may well be perceived more as elements of an

83

> impressive drama than as reminders of the
> defendant's special status.  Our society has
> become inured to the presence of armed guards in
> most public places; they are doubtless taken for
> granted so long as their numbers or weaponry do
> not suggest particular official concern or alarm.

Id.

Holbrook presents facts different from those of the case at bar.  For example, in the case at bar, Porter was the only defendant tried; in Holbrook, there were six co-defendants.  Here, the deputies stood inside the bar of the court; in Holbrook, the troopers sat outside the bar of the court.  On the other hand, Porter was directly guarded not by four deputies but by only two.  Additionally, the bar of the court was some 12 feet behind Porter, certainly a considerable distance from the first row of the gallery and only insignificantly shortened by placing chairs just inside the bar.  The circuit court also found that the deputies' field of vision would have been obstructed had they been seated instead of standing.  Given the relatively cavernous size of the well of the courtroom described by the dimensions on the record, having two deputies stand instead of sit, or to be positioned around the courtroom to help secure it, was not unreasonable or excessive.

Further, even if the deputies' positions in the courtroom and standing behind Porter were prejudicial, the

security measures were justified.  While a defendant may not, under ordinary conditions, be forced to wear visible physical restraints because of the possibility of prejudice, Deck, 544 U.S. at 629, such restraints may be constitutionally justified in the presence of a valid state interest, such as that of ensuring the security of the courtroom and those present in it, Id. at 626-27, or even that of maintaining the "dignity, order, and decorum" of court proceedings.  Illinois v. Allen, 397 U.S. 337, 343 (1970).

The record in the case at bar shows Porter had both previously disobeyed the instructions of security officers and tampered with his concealed restraining device.  On these facts, any prejudicial effect of the deputies standing behind Porter is overborne by their need to maintain an adequate field of vision of his hands, furthering the essential state interest in preserving the safety of the courtroom's occupants and ensuring Porter's continued detention.  While Porter argues that the circuit court held no hearing and made no specific finding that the security measures were justified, neither was necessary. "A trial court may consider various factors in determining" what security measures may be necessary, and "[t]his

determination need not be made upon a formal hearing."

Frye, 231 Va. at 381-82, 345 S.E.2d at 276.

Therefore, "look[ing] at the scene presented to jurors," Holbrook, 475 U.S. at 572, we find that the security measures endorsed by the circuit court presented no risk of inherent prejudice. Accordingly, the circuit court did not abuse its discretion in denying Porter's motions.

J. PORTER'S REQUEST TO INSTRUCT THE JURY ON THE DEFINITION OF "PROBABILITY" WITH REGARD TO FUTURE DANGEROUSNESS

In his seventh assignment of error, Porter contends that the circuit court erred by not providing to the jury at the penalty phase of his trial an instruction he proffered which defined the term "probability" of future violent conduct based on language in Smith v. Commonwealth, 219 Va. 455, 248 S.E.2d 135 (1978), cert. denied, 441 U.S. 967 (1979).

In Smith, this Court held that the terms "probability," "criminal acts of violence," and "continuing serious threat to society," as those terms are used in the statutory definition of the future dangerousness aggravating factor[16] are not unconstitutionally vague. Id.

---

[16] With regard to "future dangerousness," Code § 19.2-264.2 states that a sentence of death can be imposed only if a court or jury finds "a probability that the defendant

86

at 477, 248 S.E.2d at 148.  We went on to say the following about those terms:

> In our view, [the statutory language] is designed to focus the fact-finder's attention on prior criminal conduct as the principal predicate for a prediction of future "dangerousness."  If the defendant has been previously convicted of "criminal acts of violence", i.e., serious crimes against the person committed by intentional acts of unprovoked violence, there is a reasonable "probability", i.e., a likelihood substantially greater than a mere possibility, that he would commit similar crimes in the future.  Such a probability fairly supports the conclusion that society would be faced with a "continuing serious threat."

Id. at 478, 248 S.E.2d at 149.

The circuit court refused Porter's proffered jury instruction which defined "probability" and "reasonable likelihood," as follows:

> A.  A "probability" means a reasonable likelihood that the defendant will actually commit intentional acts of unprovoked violence in the future.

> B.  "A reasonable likelihood," in turn, means a likelihood substantially greater than a mere possibility.

Porter argues that pursuant to Ring v. Arizona, 536 U.S. 584, 604 (2002) (finding that aggravating factors function as the equivalent of an offense element and need to be found by a jury) and Bell v. Cone, 543 U.S. 447, 454

---

would commit criminal acts of violence that would constitute a continuing serious threat to society."

87

n.6 (2005) (raising without deciding whether, in light of Ring, an appellate court could cure a vague aggravating factor by applying a narrower construction), the proffered instruction should have been given to the jury. Because the language in Smith affects the jury's determination of the future dangerousness aggravating factor, Porter contends that the instruction should have been given in order to ensure that the jury properly found that aggravating factor in his case.

We find no error in the circuit court's refusal of Porter's proffered jury instruction. Initially, we note that this Court has previously determined that Virginia's statutes regarding the imposition of the death penalty do not suffer from the same issues that were addressed in Ring because the aggravating factors are submitted for the jury to determine. Muhammad v. Commonwealth, 269 Va. 451, 491, 619 S.E.2d 16, 39 (2005), cert. denied, 547 U.S. 1136 (2006). Porter's contention that the language from Smith should have been given to the jury rests on his interpretation that the footnote from Bell implies that any narrowing of the language of a "vague aggravating" factor provided by a higher court should be given to the jury. Bell v. Cone, 543 U.S. at 454 n.6 (emphasis added). While the Supreme Court has yet to elaborate upon its comment in

the Bell footnote, Porter's argument appears to rest on the presumption that the aggravating factor in question is "vague." This Court has consistently held that the future dangerousness aggravating factor is not unconstitutionally vague. Juniper, 271 Va. at 388, 626 S.E.2d at 401; Winston v. Commonwealth, 268 Va. 564, 579, 604 S.E.2d 21, 29 (2004), cert. denied, 546 U.S. 850 (2005); Jackson v. Commonwealth, 267 Va. 178, 205-06, 590 S.E.2d 520, 535-36, cert. denied, 543 U.S. 891 (2004). Accordingly, no additional instructions were needed in order for the jury to properly understand and determine the future dangerousness aggravating factor under the other instructions given to the jury.

K.  STATUTORY REVIEW UNDER CODE § 17.1-313

In his final assignment of error, Porter contends the circuit court erred by "imposing the sentence of death under the influence of passion, prejudice and other arbitrary factors, and by imposing a sentence that is excessive and/or disproportionate to the penalty imposed in similar cases." This assignment of error closely parallels the language in Code § 17.1-313(C), which sets out the mandatory review of a death sentence this Court must undertake under that statute. Accordingly, we consider

89

Porter's assignment of error and our statutory review together.

### 1. CODE § 17.1-313(C)(1): PASSION, PREJUDICE, OR OTHER ARBITRARY FACTORS

Porter argues that his sentence of death was imposed under the influence of four arbitrary factors, which are also four of the assignments of error in his appeal. These are the circuit court's denial of the Prison Expert Motion, comments made by the circuit court during the closing argument regarding the statutory term "society," the refusal of Porter's proffered jury instruction based on the language from Smith, 219 Va. at 477, 248 S.E.2d at 148, and the "prejudicial positioning of the courtroom deputies standing over the defendant throughout the trial." Earlier in this opinion we determined that the "errors" Porter recites here were not reversible error or were waived. Waye v. Commonwealth, 219 Va. 683, 704, 251 S.E.2d 202, 214 (1979) (stating, in the consideration of whether the jury acted under undue passion or prejudice in the conviction of a defendant for capital murder, "[i]n other parts of this opinion, we have considered each matter of which the defendant has complained. We have not found reversible error in any individual instance, and we do not now

conclude that the cumulative effect of the alleged errors was to produce a sentence influenced by passion.")

Nonetheless, this Court is mandated, pursuant to Code § 17.1-313(C)(1), to review the record in order to determine whether Porter's sentence of death "was imposed under the influence of passion, prejudice or any other arbitrary factor."  We have conducted that review and we find nothing which shows that the jury failed to fully consider the evidence presented both at trial and at sentencing or that the jury was otherwise improperly influenced to sentence Porter to death.  Accordingly, we find that the imposition of the death sentence was not imposed as a result of passion, prejudice, or any other arbitrary factor.

### 2.  EXCESSIVE AND DISPROPORTIONATE SENTENCE

Porter's assignment of error states that the death sentence he received was "excessive and/or disproportionate to the penalty imposed in similar cases."  Even though Porter has failed to present any argument in support of this assignment of error, this Court is required to consider the issue pursuant to Code § 17.1-313(C)(2).  Gray v. Commonwealth, 274 Va. 290, 303, 645 S.E.2d 448, 456 (2007); Juniper v. Commonwealth, 271 Va. 362, 432, 626 S.E.2d 383, 427 (2006).

The proportionality review this Court is required to undertake is not designed to "insure complete symmetry among all death penalty cases." Muhammad v. Commonwealth, 269 Va. 451, 532, 619 S.E.2d 16, 63 (2005) (quoting Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999), cert. denied, 529 U.S. 1113 (2000)). Rather, the goal of the review is to determine if a sentence of death is "aberrant." Id. This review also allows the Court to determine whether the death sentence has been imposed by other courts or juries for similar crimes, "considering both the crime and the defendant." Lovitt v. Commonwealth, 260 Va. 497, 518, 537 S.E.2d 866, 880 (2000).

In conducting such a review, we have focused on capital murder cases in which a law enforcement officer was killed while performing his official duties and a sentence of death was imposed after the future dangerousness aggravating factor was found. See e.g. Bell v. Commonwealth 264 Va. 172, 563 S.E.2d 695 (2002), cert. denied, 537 U.S. 1123 (2003); Eaton v. Commonwealth, 240 Va. 236, 397 S.E.2d 385 (1990), cert. denied, 502 U.S. 824 (1991); Delong v. Commonwealth, 234 Va. 357, 362 S.E.2d 669 (1987), cert. denied, 485 U.S. 929 (1988); Evans v. Commonwealth, 228 Va. 468, 323 S.E.2d 114 (1984), cert. denied, 471 U.S. 1025 (1985). In addition, this Court has

92

also reviewed similar cases in which a life sentence was imposed pursuant to Code § 17.1-313(E).  Based on this review, we find that Porter's sentence was not excessive or disproportionate to sentences imposed in capital murder cases for comparable crimes.

CONCLUSION

For the foregoing reasons, we find no reversible error in the judgment of the circuit court.  Furthermore, we find no reason to set aside the sentence of death.  We will therefore affirm the judgment of the circuit court.

Affirmed.


JUSTICE KEENAN, dissenting.

I respectfully dissent.  I join in Justice Koontz's analysis and conclusion that this Court's holding permits a defendant to be executed under void judgments.  In my view, in the absence of subject matter jurisdiction, Porter effectively was not tried for these offenses and, thus, ultimately will be executed based solely on the indictments that were returned against him.  Because the conclusion I reach requires reversal of the void judgments, I would not address any other issue in the case and would remand the case for a new trial.

93

JUSTICE KOONTZ, dissenting.

I respectfully dissent.  Today, in my view, a majority of this Court permits a capital murder conviction and death sentence to be imposed on Thomas Alexander Porter pursuant to void judgments.  I cannot join in that decision.  I do not take issue with the majority's conclusion that the evidence adduced at Porter's trial was more than sufficient to establish that Porter committed the murder of Norfolk Police Officer Stanley Reaves.  Nor do I take issue with the majority's conclusion that the death sentence in this case, properly obtained, would not be excessive or disproportionate to the penalty imposed in similar cases when reviewed under Code § 17.1-313.

The undisputed procedural facts in this case are no less than a Gordian knot of vague, conflicting, and contradictory orders entered with respect to the change of venue and the subsequent conduct of the trial and the sentencing proceeding.  They are remarkable in that they apparently have not occurred in prior cases this Court has been called upon to review.  It is unnecessary, however, to repeat in detail all of the procedural facts which are adequately recounted by the majority.  The focus here is upon the dispositive procedural facts as they implicate the pertinent statutes within the applicable statutory scheme.

94

Porter was indicted by a grand jury in the Circuit Court of the City of Norfolk (Norfolk Circuit Court) for the capital murder of Officer Reaves.[1]  Porter was subsequently brought to trial on that indictment in the Norfolk Circuit Court in accord with the mandate of Code § 19.2-244 which provides that "[e]xcept as otherwise provided by law, the prosecution of a criminal case shall be had in the county or city in which the offense was committed."  On October 2, 2006, the Norfolk Circuit Court entered an order providing "that the trial of [Porter's case] be transferred to the Circuit Court of the Fourth Judicial Circuit located in Arlington, Virginia."  This order is vague and conflicting.  There is no Fourth Judicial Circuit Court located in Arlington County; the Fourth Judicial Circuit is limited to the City of Norfolk.  Code §§ 17.1-500, -506(4).  Thus, the majority is left to observe that "[i]t is unclear from the circuit court's order whether it was transferring the place of trial with the Norfolk Circuit Court sitting in Arlington [County] or whether it was intended that the trial be conducted in

---

[1] Porter was also indicted, tried, and convicted of use of a firearm in the commission of a felony and grand larceny.  The views expressed in this dissent are equally applicable to those convictions in the context of the validity of the underlying judgments.

Arlington [County] as a trial in [the Circuit Court of Arlington County]."

Code § 19.2-251, however, is quite clear. This statute which specifically addresses a change in venue, in pertinent part, provides that: "[a] circuit court may, on motion of the accused or of the Commonwealth, for good cause, order the venue for the trial of a criminal case in such court to be changed to some other circuit court." (Emphasis added). This statute does not purport to permit the Norfolk Circuit Court to transfer itself to Arlington County; it plainly permits the Norfolk Circuit Court in this case to transfer the trial of the case to the Circuit Court of Arlington County (Arlington County Circuit Court).[2] Indeed, that is precisely what occurred in Porter's case as reflected by the subsequent and significant "felony trial orders" which were captioned, as the majority notes, "In the Circuit Court of the County of Arlington." Clearly, Porter was tried and convicted in the Arlington County

---

[2] Code § 17.1-114 permits the circuit court under circumstances not applicable here to hold its sessions at locations other than at its designated courthouse within the geographical limits of its circuit. This statute, when applicable, further provides that "[e]xcept as provided in this section or as agreed by all parties to an action, no session of a circuit court shall be held outside the geographical limits of the county or city of which it is the court."

Circuit Court. A March 7, 2007 order entered by the Arlington County Circuit Court reflects the Arlington County jury's guilty verdict on the charge of capital murder, and a March 14, 2007 order entered by that court reflects the jury's sentence of death.

The March 14, 2007 order entered by the Arlington County Circuit Court also granted Porter's motion "to refer this matter to the Probation Office for the Circuit Court of Norfolk, Virginia" and continued the case to July 16, 2007 "in the Circuit Court of the City of Norfolk." Thereafter, by order entered on July 18, 2007 in the Norfolk Circuit Court, Porter was sentenced to death in accord with the Arlington County jury verdict.

Finally, it is undisputed that Judge Charles D. Griffith, Jr., a judge of the Norfolk Circuit Court, presided over all the proceedings conducted in the Norfolk Circuit Court as well as those in the Arlington County Circuit Court. Judge Griffith, however, was never designated, pursuant to Code § 17.1-105, to preside over Porter's trial in the Arlington County Circuit Court.

Considering these undisputed procedural facts, it becomes readily apparent that Porter was tried and convicted of capital murder in one circuit court and sentenced to death in another, separate circuit court. The

resolution of the issue of the "subject matter jurisdiction" of these courts perhaps is not so readily apparent and explains the considerable efforts exerted by the majority to resolve that issue.

The foundation upon which the majority builds its analysis is its interpretation and application of Code § 17.1-513. This statute generally provides the civil and criminal jurisdiction of circuit courts and, in pertinent part, provides that "[t]hey shall also have original jurisdiction of all indictments for felonies and of presentments, informations and indictments for misdemeanors." (Emphasis added). The majority interprets this provision to mean that in Porter's case "both the Norfolk Circuit Court and the Arlington Circuit Court had subject matter jurisdiction for the trial of the charges against Porter." Without this foundation, the balance of the majority's analysis simply unravels.

Code § 17.1-513 is the statute that indeed establishes the potential subject matter jurisdiction of all the circuit courts in this Commonwealth. This statute grants the authority to adjudicate certain classes of cases, including indictments for felonies. See Morrison v. Bestler, 239 Va. 166, 169, 387 S.E.2d 753, 755 (1990). Code § 17.1-513, however, does not resolve the issue

whether a particular circuit court has subject matter jurisdiction over a particular criminal felony case. Surely, it would not be seriously contended that because all circuit courts are authorized by Code § 17.1-513 to try all indictments for felonies that an accused can be indicted for a felony committed in one jurisdiction in the Commonwealth and yet tried in another in the absence of additional statutory authority permitting that to occur. In this context, it should be evident that Code § 17.1-513 addresses only the potential jurisdiction of all circuit courts to try felony cases.

The statutory scheme implicated by the procedural facts in this case further undermines the foundation of the majority's analysis. Code § 19.2-244, in pertinent part, provides that "[e]xcept as otherwise provided by law, the prosecution of a criminal case shall be had in the county or city in which the offense was committed." Thus, in Porter's case the prosecution of the criminal charge against him was mandated to occur initially in the City of Norfolk. And, only the Norfolk Circuit Court initially had jurisdiction to try that case pursuant to Code § 19.2-239 which provides that circuit courts "shall have <u>exclusive original jurisdiction</u> for the trial of all presentments,

99

indictments and informations <u>for offenses committed within their respective circuits</u>."  (Emphasis added).

Porter requested a change of venue in this case, and the Norfolk Circuit Court granted that request as it was authorized to do pursuant to Code § 19.2-251.  However, as noted above, this statute expressly authorized the Norfolk Circuit Court to transfer venue "to some other circuit court."  Code § 19.2-253 then provides that "[t]he clerk of the court which orders a change of venue shall certify copies . . . of the record of the case to the clerk of the court to which the case is removed, . . . and such court shall proceed with the case as if the prosecution had been originally therein."  This statutory scheme makes clear that upon a change of venue the jurisdiction of the circuit court to which the case is transferred is statutorily invoked and that court then has the "exclusive original jurisdiction" to try criminal offenses "as if the prosecution had been originally therein."  Thus, the Arlington County Circuit Court had subject matter jurisdiction to try Porter's case; the Norfolk Circuit Court no longer had such jurisdiction.  In short, Code § 17.1-513 simply provides no basis to conclude, as the majority does in this case, that both circuit courts had

100

subject matter jurisdiction for the trial of the felony charges against Porter.

While the Arlington County Circuit Court exercised its jurisdiction to conduct the guilt determination phase of Porter's capital murder trial, it is undisputed that Porter was sentenced to death by the Norfolk Circuit Court. There is no statutory provision which permits one circuit court to try a capital murder case and for another circuit court to impose the sentence of death recommended by the trial jury in the initial court. Code § 19.2-264.4 contemplates that only one circuit court conduct the trial and sentencing proceedings. Moreover, even under the majority's interpretation of Code § 17.1-513 that all circuit courts have jurisdiction to try a capital murder case, Code § 19.2-251 does not purport to authorize the circuit court that conducts the guilt phase of a capital murder trial to transfer the sentencing phase of the trial to another circuit court. Therefore, in Porter's case the sentence of death imposed by the Norfolk Circuit Court was void and would require that judgment to be reversed and further require a remand to the Arlington County Circuit Court for a new sentencing hearing. See Code § 19.2-264.3(C).

101

But then there remains the issue of the authority of Judge Griffith in this case to preside over the trial itself in the Arlington County Circuit Court.  While the majority is ambivalent over whether a designation pursuant to Code § 17.1-105 was required in this case, it concludes that "a missing order of designation would only have affected the circuit court judge's authority to act in the exercise of territorial jurisdiction."  Thus, the majority disposes of the issue by concluding that it is waived because Porter did not raise the issue at his trial.

To reach this conclusion the majority goes to some length to ultimately overrule our prior decision in Gresham v. Ewell, 85 Va. (10 Hans.) 1, 6 S.E. 700 (1888), where this Court held that a judgment was "null and void" because a judge from another jurisdiction rendered a judgment without proper designation to conduct court in the jurisdiction where trial occurred.  85 Va. at 2, 6 S.E. at 701.  Until today, Ewell has been the law of this Commonwealth and I am unpersuaded by the majority's analysis which appears to be premised on little more than a change of opinion by the present majority since Ewell was decided.

In my view, that analysis is not persuasive.  In Porter's case, the judge who presided over his trial in the

Arlington County Circuit Court had no authority to do so. It is not simply a matter, however, that the judge had no authority to try a case in a jurisdiction other than the jurisdiction for which he was commissioned to serve as a circuit judge. In this case, because Judge Griffith was not designated as a judge of the Arlington County Circuit Court, Porter was tried in a court without an authorized presiding judge; indeed, he was tried in a court presided over by a person who was in essence a stranger to that court. As a result, and consistent with the rationale of Ewell, the Arlington County Circuit Court, the trial court, was not authorized to exercise subject matter jurisdiction over the guilt phase of Porter's case and the court's conviction order was therefore void and not merely voidable. Executing a defendant in reliance upon a void order of conviction is, in my view, the ultimate denial of due process. Accordingly, I would not merely reverse Porter's sentence of death but I would reverse Porter's convictions and remand the case for a new trial if the Commonwealth be so advised.

Obviously, I need go no further in my analysis of Porter's case. Nevertheless, I also dissent from the majority's determination that Porter was not entitled to have the trial court appoint Dr. Cunningham as an expert to

assist Porter in establishing that he would not present a serious threat to society if he were to be sentenced to life in prison without possibility of parole. The majority concludes that Porter did not establish a "particularized need" to have an expert assist him in presenting evidence to respond to the Commonwealth's contention that Porter was subject to the death penalty because he remained a continuing danger to society.

Under Virginia's statutory scheme, capital murder as defined in Code § 18.2-31 constitutes a Class 1 felony punishable under Code § 18.2-10, as pertinent here, only by either a sentence of death or life imprisonment. A defendant who commits a capital murder after January 1, 1995 and is sentenced to imprisonment for life is not eligible for parole, and the jury is so instructed. Code § 19.2-264.4(A); Yarbrough v. Commonwealth, 258 Va. 347, 374, 519 S.E.2d 602, 616 (1999). A defendant convicted of capital murder in Virginia becomes eligible for the death penalty only if the Commonwealth proves beyond a reasonable doubt that

> there is a probability based upon evidence of the
> prior history of the defendant or of the
> circumstances surrounding the commission of the
> offense of which he is accused that he would
> commit criminal acts of violence that would
> constitute a continuing serious threat to
> society, or that his conduct in committing the

104

offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

Code § 19.2-264.4(C)

Significantly, under this statutory scheme a finding of one or both of these aggravating factors does not mandate the imposition of the death penalty.  Rather, the jury is only "limited to a determination as to whether the defendant shall be sentenced to death or life imprisonment."  Code § 19.2-264.4(A).  "In the event the jury cannot agree as to a penalty, the court shall . . . impose a sentence of imprisonment for life."  Code § 19.2-264.4(E).

Once a defendant has been convicted of capital murder, the obviously critical issue to be determined is whether that defendant shall be sentenced to death or life imprisonment without possibility of parole.  Under Virginia's statutory scheme, the initial focus of that determination falls upon whether the Commonwealth proves beyond a reasonable doubt either of the aggravating factors that makes the defendant eligible for the death sentence.  On such a critical issue, there can be no question but that the defendant has a fundamental right to introduce appropriate evidence to rebut the Commonwealth's evidence

105

regarding these aggravating factors. See, e.g., Gardner v. Florida, 430 U.S. 349, 362 (1977) (holding that petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of "information which he had no opportunity to deny or explain"); see also, Skipper v. South Carolina, 476 U.S. 1, 8 (1986)(death sentence overturned where defendant was denied right to introduce evidence regarding his good behavior in jail). Pertinent to Porter's case, the Supreme Court in Skipper noted that "[w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule . . . that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement." Id. at 5 n.1.

In this case, the jury did not find the vileness aggravating factor had been proven by the Commonwealth's evidence and, thus, the jury's decision to impose the death sentence rested solely on its determination that Porter presented a further danger to society sufficient to warrant that penalty. Accordingly, if Porter was denied due process by the trial court's refusal to appoint an expert who would have offered testimony to rebut the Commonwealth's assertions of future dangerousness, then

unquestionably the sentence of death must be vacated. The Commonwealth does not contend that Porter was financially able to independently employ such an expert.

Recently, in Juniper v. Commonwealth, 271 Va. 362, 626 S.E.2d 383, cert. denied, ___ U.S. ___, 127 S.Ct. 397 (2006), this Court held that the jury's "determination of future dangerousness revolves around an individual defendant and a specific crime." Id. at 425, 626 S.E.2d at 423. The Court explained that in admitting expert testimony as pertinent in rebuttal of the Commonwealth's attempt to prove future dangerousness, "such evidence should 'concern the history or experience of the defendant.' " Id. at 425-26, 626 S.E.2d at 423. (quoting Cherrix v. Commonwealth, 257 Va. 292, 310, 513 S.E.2d 642, 653, cert. denied, 528 U.S. 873 (1999)). The Court has further explained that only "evidence peculiar to a defendant's character, history and background is relevant to the future dangerousness inquiry." Bell, 264 Va. at 201, 563 S.E.2d at 714. In accordance with this reasoning, the Court has previously rejected expert testimony regarding generalized "daily inmate routine [and] general prison conditions." Burns v. Commonwealth, 261 Va. 307, 338, 541 S.E.2d 872, 892, cert. denied, 534 U.S. 1043 (2001).

Applying these principles, the Court has upheld a trial court's decision to deny the appointment of a risk assessment expert where the testimony proffered was not sufficiently specific and particularized to the defendant to rebut the Commonwealth's assertions that the defendant would pose a future danger to society. Accordingly, in Juniper, this Court upheld a trial court's rejection of expert testimony where

> [n]either the actual proffer, counsel's argument, nor [the expert's] explanations . . . was "specific to [the defendant]". . . . [The expert] offered nothing to the trial court to support his opinion as being based on [the defendant's] individual characteristics that would affect his future adaptability in prison and thus relate to a defendant-specific assessment of future dangerousness.

Id. at 427, 626 S.E.2d at 424 (internal citations omitted). Similarly, in Burns, 261 Va. at 340, 541 S.E.2d at 893, the Court rejected the appointment of a risk assessment expert to rebut the Commonwealth's future dangerousness assertions where the expert's testimony failed to "focus . . . on the particular facts of [the defendant's] history and background, and the circumstances of his offense."

In my view, Dr. Cunningham's proffered testimony regarding the question of Porter's future dangerousness is sufficiently specific and particularized with respect to Porter's individual characteristics, history and

108

background, and past offenses.  In the affidavit proffered by Porter in support of his motion for Dr. Cunningham's appointment, Dr. Cunningham explained that his "individualized assessment" evaluated a number of factors in determining whether a particular defendant posed a future danger to society.  The affidavit detailed the typical scientific basis and methodology used by the doctor in assessing a particular defendant, including "his age, his level of educational attainment . . . other features and characteristics regarding him [and] particularized to him based on demographic features, adjustment to prior incarceration, offense and sentence characteristics, and other factors."  It also included information regarding how, if appointed, Dr. Cunningham would determine the setting and time span in which Porter's violent conduct would be likely to occur, the base rate of serious violence in that particular setting, and the individual characteristics and prior record of Porter in relation to the likelihood of serious violence in the prison setting.

Thus, I am persuaded that Dr. Cunningham's proffered testimony was relevant to the issue of Porter's future dangerousness because it was sufficiently "specific" to Porter based on Porter's individual characteristics, and focused "on the particular facts of [Porter's] history and

background, and the circumstances of his offense."

Juniper, 271 Va. at 426, 626 S.E.2d at 423; see also Burns, 261 Va. at 340, 541 S.E.2d at 893.  Accordingly, even if I could agree with the majority that the failure to establish proper jurisdiction in this case was merely a failure of "territorial" jurisdiction and the objection thereto was waived by Porter's failure to raise the issue, I would nonetheless hold that Porter was denied due process because he was denied the opportunity to present competent, relevant expert testimony to rebut the Commonwealth's assertion that he posed a continuing danger to society. And on this ground, I would vacate the sentence of death imposed on Porter and remand the case for a new sentencing proceeding in which Porter would have the benefit of Dr. Cunningham's testimony.[3]

Finally, I am compelled to warn that the various issues raised in this case may tend to exemplify certain aspects of the conduct of capital murder trials in this Commonwealth that slowly, but inexorably, will erode public confidence that the death penalty is being imposed in a

---

[3] I have not addressed the courtroom security issue raised by Porter, though I am troubled by the possibility that excessive security measures may have created prejudice against Porter in the sentencing phase of his trial. Accordingly, I do not join in the majority's decision to affirm on that issue.

fair and consistent manner. Surely, the citizens of Virginia expect, and have the right to expect, that the courts of the Commonwealth will conduct death penalty trials with due regard for the constitutional and statutory safeguards that are meant to ensure that the maximum penalty will be imposed only in those instances where it is truly necessary to advance the cause of justice and secure the lives and welfare of the people. Moreover, it should be expected, and justice demands, that even in cases where a sentence of death may be appropriate, its imposition will occur through a strict and faithful adherence to due process of law. If the courts empowered to sit in judgment over those accused of typically heinous crimes fail to take the greatest care in assuring the fairness of the proceedings that result in the imposition of the death penalty, then it must inevitably follow in time that the death penalty statutes of this Commonwealth will no longer pass constitutional muster. For now, however, I take some comfort in the conclusion that the manner in which Porter's case was conducted is atypical of the manner in which our trial courts conduct capital murder trials.